2025-1784

# United States Court of Appeals
# For the Federal Circuit

STA GROUP LLC,
*Appellant*

v.

MOTOROLA SOLUTIONS INC.,
*Appellee*

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2023-01294

## CORRECTED APPELLANT'S OPENING BRIEF

April 23, 2026

Jason A. Engel
K&L Gates LLP
70 W. Madison St., Suite 3300
Chicago, IL 60602
Phone: 312-807-4236
Email: jason.engel@klgates.com

Erik J. Halverson
K&L Gates LLP
4 Embarcadero Center
San Francisco, CA 94111
Phone: 415-882-8238
Email: erik.halverson@klgates.com

*[additional counsel on inside cover]*

Nicholas F. Lenning
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Phone: 206-370-6685
Email: nicholas.lenning@klgates.com

**COUNSEL FOR APPELLANT
STA GROUP LLC**

***Exemplary Claim of U.S. Patent No. 8,831,664 ("'664 patent")***

Claims 1-20 of the '664 patent were challenged. All claims 1-20 were found unpatentable. Claim 1 is exemplary and is shown below:

1.    A method, comprising:
monitoring media streams associated with channels in a communication environment;
receiving an alert in one of the media streams; and
elevating a priority associated with the media stream receiving the alert, such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment.

Appx00049, (Cl. 1).

FORM 9. Certificate of Interest

Form 9 (p. 1)<br>March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1784

**Short Case Caption** STA Group LLC v. Motorola Solutions Inc.

**Filing Party/Entity** STA Group LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/23/2026          Signature: /s/ Jason A. Engel

Name: Jason A. Engel

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| STA Group LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| K&L Gates LLP: Jared R. Lund | K&L Gates LLP: Kyle M. Kantarek | |
| K&L Gates LLP: Clare Frederick | K&L Gates LLP: Dennis A. Majewski | |
| K&L Gates LLP: Brenna Legaard | K&L Gates LLP: Nolan R. Hubbard | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)    ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page(s)**

I.  Statement of Related Cases ..................................................................1

II.  Jurisdiction..........................................................................................2

III.  Introduction.........................................................................................3

IV.  Statement of the Issues ......................................................................6

V.  Statement of the Case .........................................................................7

   A. The '664 Patent..............................................................................8

   B. The PTAB Proceedings ................................................................14

      1. Overview of Kim.......................................................................12

      2. The FWD .................................................................................14

VI.  Summary of the Argument ...............................................................18

VII.  Argument ..........................................................................................20

   A. Legal Standards ............................................................................20

   B. The Board Committed Legal Error In Determining that "an endpoint in the communication environment" Was Disclosed By Kim's TV System Display Or Speaker.......................................................................21

      1. Petitioner Raised a New Argument at the Oral Hearing ..........21

      2. The Speaker or Display Are Not Endpoints of the Communication Environment ..................................................25

   C. The Board Committed Legal Error In Construing "elevating a priority of the media stream" As Changing Hardware Settings Of How The Media Stream Is Ultimately Displayed and/or Emitted from Kim's TV ...........31

      1. The Claimed Adjustments are Made to How the Media Stream is Provisioned..................................................................32

      2. Kim Does Not Adjust How the Media Stream is Provisioned.................33

VIII.  Conclusion .......................................................................................38

# TABLE OF AUTHORITIES

**CASES**

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015)..................................................................18

*Google LLC v. EcoFactor, Inc.*,
92 F.4th 1049 (Fed. Cir. 2024) .......................................................... 18, 19

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*,
977 F.3d 1212 (Fed. Cir. 2020)..................................................................18

*In re IPR Licensing, Inc.*,
942 F.3d 1363, 1369 (Fed. Cir. 2019).......................................................18

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021)....................................................................18

*Koninklijke Philips N.V. v. Google LLC*,
948 F.3d 1330 (Fed. Cir. 2020)..................................................................19

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005)..................................................................21

*Nike, Inc. v. Adidas AG*,
955, F.3d 45 (Fed. Cir. 2020).....................................................................18

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)............................................................ 18, 19

*Qualcomm Inc. v. Intel Corp.*,
6 F.4th 1256 (Fed. Cir. 2021).....................................................................21

*SAS Institute, Inc. v. Iancu*,
584 U.S. 357 (2018)........................................................... 3, 16, 18, 19

*Sigray, Inc. v. Carl Zeiss X-Ray Microscopy, Inc.*,
137 F.3th 1372 (Fed. Cir. 2025) .................................................................18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*SSI Techs., LLC v. Dongguan Zhengyang Elect. Mech. LTD,*
  59 F.4th 1328 (Fed Cir. 2023) ...............................................................21

*TQ Delta, LLC v. Cisco Sys., Inc.,*
  942 F.3d 1352 (Fed. Cir. 2019)..............................................................18

**STATUTES**

28 U.S.C. § 1295................................................................................2

35 U.S.C. § 142.................................................................................2

35 U.S.C. § 312...............................................................................21

35 U.S.C. § 314.................................................................................7

35 U.S.C. § 318................................................................................2

35 U.S.C. § 6..................................................................................2

35 U.S.C. §§ 311-319..........................................................................2

**RULES**

Fed. Cir. R. 15(a)(1)..........................................................................2

**REGULATIONS**

37 C.F.R. § 42.100...........................................................................18

37 C.F.R. § 90.3...............................................................................2

iii

## I.    STATEMENT OF RELATED CASES

This appeal concerns the final written decision ("FWD") issued by the United States Patent and Trademark Office ("PTO") Patent Trial and Appeal Board ("PTAB" or the "Board") in Case No. IPR2023-01294, finding claims 1-20 (the "Challenged Claims") of U.S. Patent No. 8,831,664 (the "'664 patent") unpatentable.  Appx00001-00037.

No other appeal in or from that same proceeding was previously before this Court or any other appellate court.  Except for the following matters that also concern the '664 patent, counsel is unaware of any other case pending in this Court or any other court or agency that will directly affect or be directly affected by this Court's decision:

*STA Grp. LLC v. Motorola Solutions, Inc.* Case No. 2:22-cv-00381 (E.D. Tex. filed Sept. 30, 2022).

*STA Grp. LLC v. Motorola Solutions, Inc.* Case No. 2:24-cv-00234 (E.D. Tex. Filed Apr. 8, 2024).

The '664 patent was also asserted against Appellee in an identical Complaint in *STA Grp. LLC v. Motorola Solutions, Inc.* Case No. 4:22-cv-00840 (E.D. Tex. filed Sept. 30, 2022), which was filed in error on September 30, 2022 and administratively closed October 6, 2022 without any substantive litigation.

## II.     JURISDICTION

The Board had jurisdiction under 35 U.S.C. §§ 6, 311-319 and issued its final written decision under 35 U.S.C. § 318(a) on March 14, 2025.  Appx00001.  STA Group LLC timely filed its notice of appeal on May 14, 2025, under 35 U.S.C. § 142, 37 C.F.R. § 90.3(a)(1) and Fed. Cir. R. 15(a)(1).  Appx00649-00653.

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

### III.    INTRODUCTION

The '664 patent discloses a method that dynamically controls how media streams are provisioned to endpoints over communication channels in response to identifying alerts within the media streams. Appx00038, Abstract; Appx00047, 3:56-6:9. Communication channels are often statically configured (rather than dynamically configured) and manually adjusted by an end user. Appx00046, 1:36-38. The inventors of the '664 patent recognized that with static configurations the channels are not always configured optimally, which results in a message not being received appropriately by an intended recipient. Appx00046, 1:39-41. The communication system claimed by the '664 patent addresses this issue by identifying an alert message in a media stream and ensuring the alert message is properly received by using various novel techniques. Appx00047, 3:56-4:9. For example, a media stream on a channel containing an alert message may be prioritized by increasing a volume of the media steam itself, decreasing volumes of deprioritized channels, changing an audio direction of the channel of the media stream with the alert (e.g., communications to the left ear may be provisioned to the right ear or vice versa), or some combination thereof. Appx00047, 3:59-4:4.

In the FWD, independent claims 1, 11, and 16 were found unpatentable based on WO 2004/034350 A1 to Chang-Eui Kim, entitled "Television Set and Method for Notifying a Disaster Situation" ("Kim"). Kim discloses a novel television that displays emergency-warning broadcast information. Appx01685. Notably, the video and audio provided on the

3

television channels of Kim are static—this static configuration is exactly what the '664 patent identifies as being in conventional systems, and is what the '664 patent is intended to improve upon.  Appx03624, ¶80; Appx03625, ¶84; Appx03657-03661, ¶¶141-142; *see* Appx00046, 1:33-41 (the '664 patent describing the issues of static channel configurations in conventional systems).  Rather than "elevating a priority associated with the media stream receiving the alert, such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment" Kim adjusts hardware settings to display and/or emit the media stream after the media stream has been received.

In arriving at its conclusion, the Board committed legal error in its analysis of certain limitations of claim 1 in the '664 patent; namely, "an endpoint in the communication environment" and "elevating a priority associated with the media stream receiving the alert, such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment."  The errors tainted the Board's conclusion of obviousness under 35 U.S.C. § 103, which should be overturned for the foregoing reasons.

First, the Board considered and relied upon, an argument regarding the claimed endpoint, which was not raised by Appellee during the course of the proceeding. Appx00023.  Rather, this argument was raised for the first time at the oral hearing. Appx00602.  "[T]he petitioner's petition… is supposed to guide the life of the litigation." *SAS Institute, Inc. v. Iancu*, 584 U.S. 357, 366 (2018).  The Board committed legal error in relying on this argument in its Final Written Decisions.  Appx00023.

4

Second, the Board also committed legal error in adopting this newly raised argument, as it was based on an improper construction of the claim language. This construction failed to afford the full term "endpoint in the communication environment" its plain and ordinary meaning, and resulted in the Board inconsistently finding that Kim's TV system sub-components are endpoints in the same way that Kim's TV system as a whole is an endpoint. Appx00023; Appx00049, 8:38-39.

Third, the Board committed legal error in construing the claim so broad as to include an adjustment in hardware settings as "an adjustment… to how the media stream is provisioned to an endpoint[.]" Appx00023; Appx00049, 8:37-39. This incorrect construction improperly captures the very systems the '664 patent identified, distinguished, and improved upon. Instead, the claimed adjustments must be to how the media stream itself is provisioned, not how the media stream is ultimately emitted or displayed.

Therefore, the judgment of the Board should be reversed or, at a minimum, remanded to the Board for further consideration in accordance with the proper interpretation of the claims and limited to the scope of argument actually presented in the Petition.

## IV.    STATEMENT OF THE ISSUES

1. Did the Board commit legal error in finding the speaker or display of Kim's TV system as an "endpoint in the communication environment" when Appellant did not raise this argument until the oral hearing?

2. Did the Board commit legal error in construing the claimed "endpoint in the communication environment" as including the speaker or display of Kim's TV system?

3. Did the Board commit legal error in construing "elevating a priority associated with the media stream receiving the alert, such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment" as changing hardware settings of Kim's TV system?

## V.    STATEMENT OF THE CASE

On August 21, 2023, Appellees filed an IPR petition challenging claims 1-20 of the '664 patent as being unpatentable over 9 grounds (the "Petition"), including the following Gound 7, Ground 8, and Ground 9:

| Ground | '664 Patent Claims | Basis for Challenge |
|---|---|---|
| 7 | 1-2, 6-9, 11-12, 15-17, 20 | Obvious over International Patent Publication No. WO 2004/034350 A1 to Chang-Eui Kim, entitled "Television Set and Method for Notifying a Disaster Situation" (filed Oct. 9, 2003, with priority to Oct. 9, 2002, and published Apr. 22, 2004) **("Kim")** |
| 8 | 3-5, 13-14, 18-19 | Obvious over Kim in view of Japanese Patent Publication No. 2006-340164 A to Yoshihiro Ishibashi, entitled "Emergency-Alert Broadcast Receiver and Method for Receiving Emergency-Alert Broadcasts" (filed June 3, 2005, and published Dec. 14, 2006) (Original Japanese Application, Translation, and Translator's Affidavit) **("Ishibashi")** |
| 9 | 10 | Obvious over Kim in view of U.S. Patent No. 7,330,693 to Stephen Clifford Goss, entitled "Broadcast Channels for Wireless Telephony" (filed Sep. 17, 1999, and issued Feb. 12, 2008) **("Goss")** |

Appx00098, Appx00104, Appx00114, Appx00178-00201.

The Board granted institution of the Petition under 35 U.S.C. § 314 on March 22, 2024.  Appx00310, Appx00329.  On March 14, 2025, the Board issued the FWD, finding that claims 1, 2, 6-9, 11, 12, 15-17, and 20 were unpatentable over Kim (Ground 7), that claims 3-5, 13, 14, 18, and 19 were unpatentable over Kim in view of Ishibashi (Ground 8),

7

and that claim 10 was unpatentable over Kim in view of Goss (Ground 9).  Appx00001, Appx00035-00036.  In doing so, the Board committed three legal errors, resulting in a FWD that is not supported by substantial evidence.

## A.    The '664 Patent

The '664 patent discloses and claims a novel communication system that dynamically controls how media streams are provisioned to endpoints over communication channels in response to identifying alerts within the media streams.  Appx00038, Abstract; Appx00047, 3:56-6:9. This communications system provides value when implemented in a Push-to-talk (PTT) context for emergency personal and first responders.

PTT devices are commonly carried by emergency response personnel and support a single channel or a plurality of channels.  Appx00046, 1:29-32.  Management centers that broadcast to the PTT devices can be configured to broadcast more important channels so they are heard in one ear and less important channels are heard in another ear. Appx00046, 1:33-35.  The inventors of the '664 patent recognized that these channels are configured statically, where an end user has to manually adjust a volume of each channel.  Appx00046, 1:36-41.  This manual adjustment is suboptimal because channels may not be fully utilized and important emergency messages may not be received by the recipient when those emergency messages are received on channels that have their volume turned down.  Appx00046, 1:36-46.

In a typical example of PTT use, a police officer uses a radio, which is configured by a management center to receive a UHF channel on a right ear and a VHF channel on a left ear. Appx00047, 3:34-45. The VHF channel may receive passive communications while the UHF receives more critical dispatcher communications, and both channel volumes can be adjusted independently by the police officer using a hardware setting on the PTT device. *Id.* However, urgent messages may sometimes be received over the VHF radio, but the officer may miss said message because they have reduced the volume of the lower-priority VHF channel. Appx00047, 3:46-55.

The '664 patent presents a novel communication system to more readily identify the alert message and ensure the message is properly received by an end user using a novel solution. Appx00047, 3:56-4:9. In an example, communications to the left ear may be provisioned to the right ear or vice versa after an alert message is detected in a media steam. Appx00047, 3:59-62. In another example, the volume of the media stream with the alert message could be provisioned for communication at a higher volume. Appx00047, 3:62-65. Further, the management center may identify the primary channel, move the alert to the primary channel, and marginalize other communications during the alert message period. Appx00047, 3:65-4:4.

Figure 1 (reproduced below) depicts "a simplified block diagram of the communication system for providing channel configurations in a communications environment[.]" Appx00046:1:55-57. The communication system 10 includes a server 14

9

and IP network 20 coupled to a router media service (RMS) element 30 and universal media service (UMS) element 34. Appx00046, 2:34-40. Because the UMS has information regarding the listeners of a given channel, the UMS "has the intelligence to understand which streams should be given priority over other streams." Appx00048, 5:24-28. This unique configuration enables the UMS to shift the streams or elect specific streams at a certain volume to be propagated to an end user. Appx00048, 5:28-30.



Appx00041, Fig. 1.

The RMS or UMS may include a mixer, which may facilitate assignment of media streams and control the relative volume of each media streams. Appx00048, 5:34-43. The resulting streams are streamed to the management center. Appx00048, 5:43-45. The management center may alternatively perform some or all of the mixing functions.

10

Appx00048, 5:37-40, 5:48-50.  In other words, "the provisioning is being done externally, and the individual endpoints do not have to be capable of managing these alert messages." Appx00048, 5:50-52.  Rather, "each channel is receiving the stream at a prescribed volume." Appx00048, 5:62-63.  So, the volume of the channel itself is adjusted rather than changing a volume hardware setting on the PTT device.  Appx00048, 5:62-63.

Figure 5 (reproduced below) depicts "a simplified flowchart illustrating a scenario implicating the communication system."  Appx00046, 2:4-5.  At step 100, the channel of the end-user device is set as a low priority channel with a low volume.  Appx00049, 7:61-63.  At step 102, the system monitors whether an alert indication has been received.  Appx00049, 7:66-67.  Step 102 is repeated until an alert indication is received.  Appx00049, 8:1-5.  When an alert indication is received, the process moves to step 104 where the system increases the volume of the channel and/or moves the channel to the high priority spatial position.  *Id.* Optionally, at step 106, the system may reduce the volume of other channels.  Appx00049, 8:6-7.  During this process, the adjustment to the audio volume of the channel is made to the media stream itself rather than the endpoint settings, as the management center does not have access to the endpoint settings.  Appx00048, 5:36-40, 5:62-63; Appx03599-3600, ¶26; Appx03601, ¶29.



FIG. 5

Appx00045, Fig. 5.

## B.    Overview of Kim

Kim discloses a novel TV that displays emergency-warning broadcast information. Appx01685. The TV is designed to display the emergency-warning program even when the television is off or is displaying media from an external device (such as a VCR). Appx01686. Figure 5 (reproduced below) "is a block diagram illustrating a TV system for the purpose of an emergency-warning broadcast[.]" Appx01689. Figure 5 depicts Kim's novel TV, which has a dedicated emergency-warning broadcast tuner. Appx01704. Kim's TV includes a first

12

broadcast signal receiver 10, a second broadcast signal receiver 15, a plurality of switches, and a controller 70 that controls the overall operations of the TV system through control program data stored in a memory 85.  Appx01695, Appx01696, Appx01704.



Appx01730, Fig. 5 (annotations in red).

The second broadcast signal receiver 15 is a receiver dedicated to receiving the emergency-warning broadcast signal.  Appx01704.  Meanwhile, the first broadcast signal receiver 10 receives a predetermined selection broadcast signal.  Appx01693, Appx01694. The first audio switching unit 110 of Kim's TV selects and outputs either an audio signal from the external source (e.g., a VCR) or from the second broadcast signal receiver 15 according to a control signal from a controller 70.  Appx01705.  Likewise, the second audio

13

switching unit 120 selects and outputs either the output signal from the first audio switching unit 110 or the audio from the first broadcast signal receiver 10. Appx01705. The output of the second audio switching unit 120 is processed using the audio signal processor 40 and audibly output using the audio signal generator 50. Appx01705. The audio signal processor 40 includes an amplifier that adjusts the volume output by Kim's TV based on a signal the audio signal processor 40 receives from the controller. Appx01694, Appx01695.

Similarly, the video signals from the first broadcast signal receiver 10, second broadcast signal receiver 15, and the external source device are selected using the first video switching unit 130 and second video switching unit 140, processed by the video signal processor 20, and output via a Cathode Ray Tube (CRT). Appx01705, 20-25; Appx01706, 1.

Notably, the video and audio provided on the television channels of Kim are static—this static configuration is exactly what the '664 patent identifies as being in the conventional systems and is what the '664 patent is intended to improve upon. Appx03624, ¶80; Appx03625, ¶84; Appx03657-03661, ¶¶141-142; *see* Appx00046, 1:33-41 (the '664 patent describing the issues of static channel configurations in conventional systems).

## C. The PTAB Proceedings

In the Petition, the Appellee argued that independent claim 1, among others, was obvious in view of Kim. Appx00178-00183. Particularly, the Appellee argued that Kim disclosed "elevating a priority associated with the media stream receiving the alert, such that

an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment[.]" Appx00009, Appx00181-00184.  In this argument, the Petition identified "the viewer's television" as "an endpoint in the communication environment.  Appx181; *see* Appx00184.  The Petition argued these limitations in the context of the claim 1 and incorporated these arguments as reference in the context of claims 11 and 16.  *See* Appx00189-191.

However, Appellant rightfully identified insufficient arguments raised by Appellee with respect to limitation 1[c].  Appx00374, Appx00417-00427.  In the Patent Owner Response, Appellants argued that Kim does not (1) adjust how the media stream is provisioned to an endpoint in the communications environment, nor (2) elevate a priority associated with a media stream receiving the alert.  Appx00418-00419.  First, because the media stream is *provisioned to an endpoint*, the adjustment must occur before the endpoint (in the case of Kim, the TV) receives the media stream, which is not disclosed in Kim.  Appx00419.  Second, Kim does not elevate the priority of a media stream, but instead receives and processes the media stream in the exact same form as it was originally broadcast.  Appx00421.  In Kim, the TV adjusts the volume itself.  Appx01694; Appx01695.

In the Petitioner Reply, Appellee persisted with the argument that the TV system rendered the claimed endpoint obvious.  Appx00481 (referring to Kim's "television endpoint").  Not until the oral hearing did Appellee argue for the first time that Kim's speaker or display could be an endpoint in the communication environment.  Appx00601, 16-19;

15

Appx03368. Appellee had not previously identified the speaker or display in Kim as an endpoint in the communication environment for Ground 7. *See* Appx00181-00184; Appx00481.

In the FWD, the Board found that "Patent Owner's arguments are not persuasive because they are not commensurate with the claim language." Appx00019. Instead, the FWD found the plain and ordinary meaning of "provisioned ***to an endpoint*** in the communication environment" as allowing that same endpoint to perform its own provisioning. Appx00020. Stated otherwise, the FWD interprets claim 1 to "encompass[] an adjustment that is made to how the media stream is provisioned to *any* endpoint of the communications environment" Appx00022 (emphasis in original).

Further, the FWD also found that "Patent Owner provides an erroneously simplistic view of the television" and that, because the television "makes adjustments to how media streams are provisioned to audio signal generator 50 and video signal generator 40[.]" In doing so, the FWD adopted Appellee's argument raised for the first time at the oral hearing, stating that there is "no basis for construing 'endpoint' as excluding the speaker or display of Kim's TV system. Appx00022-00023. The FWD supports this conclusion with specific reference to testimony obtained during deposition of Appellant's declarant. Appx00023; *see also*, Appx00023 n. 9. However, the testimony of Appellant's declarant was provided in a vacuum and not in the context of the communication environment, and the interpretation of an endpoint was inconsistent with the previous positions raised by Petitioner . Appx00618.

The Board also held that Kim disclosed "elevating a priority associated with the media stream" because "[t]he adjustments disclosed by Kim are turning on the TV (which would include a display and speaker components), tuning to the prescribed channel (affecting both the display and speaker), increasing the volume output by the speaker, and processing captions for the display." Appx00023.

Beyond these adjustments, the Board had no further explanation for how Kim disclosed "elevating a priority associated with the media stream[.]" *Id.*

## VI.   SUMMARY OF THE ARGUMENT

The Board committed legal error in its analysis of certain limitations of the '664 patent; namely, "an endpoint in the communication environment" and "elevating a priority associated with the media stream receiving the alert, such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment."  The errors tainted the Board's conclusion of obviousness under 35 U.S.C. § 103, which should be overturned for the foregoing reasons.

The Board erred with respect to "an endpoint in the communication environment." *First*, in the FWD, the Board adopted an argument raised by Appellee for the first time at the oral hearing, that the speaker or display of the TV was the claimed endpoint, not the TV system itself.  The Board erred in considering this argument as "the petitioner's petition… is supposed to guide the life of the litigation." *SAS Institute*, 584 U.S. at 366.

*Second*, the Board also erred in its construction of this limitation to conclude that the speaker or display were endpoints.  In arriving at this decision, the Board did not afford appropriate weight to the language "in the communication environment."  Due to the incorrect construction, the Board wrongly concluded that adjustments were made to how the media stream is provisioned.

*Third*, the Board also erred in its construction of "elevating a priority associated with the media stream receiving the alert, such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment."  The Board

18

ignored that the adjustments in the '664 patent are specifically made to *the provisioning* of the media stream rather than the hardware settings used to display and/or emit the media stream from the TV to ensure the alert message is received. In arriving at this decision, the Board found that the '664 patent claimed adjusting settings of static channels, which is exactly what the '664 patent identifies as being conventional and is what the '664 patent intended to improve upon.

Absent these errors, the Board would have recognized the nonobvious invention of the '664 patent. Accordingly, the FWD should be reversed or, at a minimum, remanded to the Board for further consideration.

19

## VII.   ARGUMENT

### A.     Legal Standards

This Court reviews legal questions *de novo* and underlying factual determinations for substantial evidence.  *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1357 (Fed. Cir. 2019) (citing *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015)).

In an IPR proceeding, "the petitioner's petition…is supposed to guide the life of the litigation." *SAS Institute*, 584 U.S. at 366; *see Nike, Inc. v. Adidas AG*, 955, F.3d 45, 52 (Fed. Cir. 2020) (rejecting the argument that "the Board is free to adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR."). Whether the Board relied on new arguments instead of those advanced by the Petition is subject to *de novo* review.  *In re IPR Licensing, Inc.*, 942 F.3d 1363, 1369 (Fed. Cir. 2019).

Claim construction is a question of law decided on a *de novo* review, as are the intrinsic-evidence aspects of the analysis.  *Intel Corp. v. Qualcomm Inc.,* 21 F.4th 801, 808 (Fed. Cir. 2021).  In an IPR proceeding, claims should be construed to have their plain and ordinary meaning as articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  37 C.F.R. § 42.100(b); *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1216 (Fed. Cir. 2020).

The Board has construed a claim if its analysis establishes the scope and meaning of a claim.  *Sigray, Inc. v. Carl Zeiss X-Ray Microscopy, Inc.*, 137 F.3th 1372, 1377 (Fed. Cir. 2025) (citing *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1056 (Fed. Cir. 2024)).  "[T]here

is no magic formula or catechism for conducting claim construction." *Phillips v. AWH*, <u>415 F.3d at 1324</u>. However, to construe claims, the intrinsic evidence, including the claims themselves, the specification, and the prosecution history is usually dispositive. *Google v. EcoFactor*, <u>92 F.4th at 1058</u>.

**B.    The Board Committed Legal Error In Determining that "an endpoint in the communication environment" Was Disclosed By Kim's TV System Display Or Speaker**

The Board committed at least two legal errors in finding that TV display or speaker rendered the claimed endpoint obvious. **<u>First</u>**, the Board improperly considered an argument that was raised for the first and only time at the oral hearing. **<u>Second</u>**, the Board incorrectly interpreted the speaker or display as an "endpoint in the communication environment." Both legal errors constitute independent bases to reverse the FWD.

### 1.    *Petitioner Raised a New Argument at the Oral Hearing*

It is improper for the Board to consider an obviousness challenge not raised in the Petition. *SAS Institute*, <u>138 S. Ct. at 1355</u> ("the statute envisions that a petitioner will seek an inter partes review of a particular kind—one guided by a petition describing 'each claim challenged' and 'the grounds on which the challenge to each claim is based.'") (quoting <u>35 U.S.C. § 312(a)(3)</u>); *see Koninklijke Philips N.V. v. Google LLC,* <u>948 F.3d 1330, 1337</u> (Fed. Cir. 2020) (concluding that "the Board erred by instituting inter partes review" because "[petitioner] did not advance such a combination of references in its petition").

Like with traditional televisions, the TV system of Kim includes a speaker and display as subcomponents. Appx01693, Appx01694-01695. Throughout the proceedings, the Appellee, Appellant, and the Board identified the TV system of Kim as an endpoint in a communication environment—this was no longer in dispute. Appx00022; Appx00326-00328; Appx00181, Appx00183-00184; Appx00184; Appx00418; Appx00481. In the Petition and Reply, Appellee never identified the speaker or display of Kim's TV as an endpoint in the communication environment for Ground 7. *See* Appx00181-00184; Appx00479-00489. Instead, Appellee only identified the TV system as a whole as the endpoint, not its subcomponents. Appx00181, Appx00183-00184; Appx184; Appx00481. For example, in the Petition, Appellee argued that:

> Kim discloses "*elevating a priority associated with the media stream* [*e.g.,* digital broadcast data] *receiving the alert* [*e.g.,* emergency-warning broadcast], *such that an adjustment is made to how the media stream is provisioned* [*e.g.,* adjusting volume of the media stream relative to other broadcast data via audio signal processor 40 or controlling power supply unit 75] *to an endpoint in the communication environment* [*e.g.,* the viewer's television]."

Appx00181 (emphasis and bracketed text in original). The Petition argues that "*adjustments* to power, mode, output, and volume all serve to *elevate* the visibility (*priority*) of the digital broadcast data (*media stream*) receiving the emergency-warning information (*alert*) by *adjusting* how that broadcast (*media stream) is provisioned* to the viewer's television." Appx00183-00184 (emphasis in original). Additionally, the Petition states that "[t]he *viewer's television* exchanges data; *it receives broadcast signals* from the receivers and

22

sends remote control signals to the receiver." Appx00184, n. 9 (emphasis added). There is no reference to a speaker or display as an endpoint in Ground 7. Appx00181-184.

Moreover, Appellee failed to raise this argument even in its Reply. Instead, Appellee persevered with its Ground 7 argument relying on Kim's TV system as the endpoint. Appx00481 ("PO's attempt to distinguish Kim because its **television endpoint** 'reacts to received broadcast television signals by adjusting endpoint settings' fails.") (emphasis added). Appellee argued **for the first time** at the oral hearing that Kim's speaker or display could be an endpoint in the communication environment. Appx00601, 16-19; Appx03368. This argument was ultimately adopted by the Board. Appx00023 ("We discern no basis for construing 'endpoint' as excluding the speaker or display of Kim's TV system.").

Identification of the appropriate endpoint has a material bearing on the patentability of claim 1 of the '664 patent. Claim 1 requires that "an adjustment is made to how the media stream is **provisioned to** an endpoint[.]" Appx00049, 8:37-38 (emphasis added). In other words, the adjustments are made by an element other than the claimed endpoint, which then provisions the media stream to the claimed endpoint in a communication environment. *Id*. In Kim, the TV system itself performs what the Appellee alleges to be "adjustments to how the media stream is provisioned[.]" Appx00182. For example, Appellee argues that:

> Upon receiving an emergency-warning broadcast (*alert*), controller 70 *adjusts* and *elevates the priority of the media stream receiving the alert* by "power[ing] the TV system on, convert[ing] a system operation mode into a TV viewing mode, and control[ing] the TV system to output broadcast data of the prescribed emergency-warning broadcast channel in the form of AV data."… Additionally, the controller "outputs a volume control signal to increase a

23

volume level of the TV system.' ... Controller determines which of these adjustments need to be made[.]"

Appx00182-00183 (quoting Appx01710-01711) (emphasis in original).

However, as shown in Figure 5 (reproduced below) the controller is part of the TV system.  So, if the TV system is the claimed "endpoint," then Kim does not perform "an adjustment…to how the media stream is provisioned to an endpoint in the communication environment." Appx00049, 8:37-39.



Appx01730, Fig. 5.

In recognition of the Appellee's flawed position, Appellee raised for the first time at the oral hearing that the TV system is a communication environment, and that the display or

24

speaker are the endpoints. ***Even if*** the new argument raised by Appellee at the oral hearing was proper, the hearing did not provide Appellant with an adequate opportunity to respond. *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1265 (Fed. Cir. 2021). As Appellee raised a new argument for the first time at the oral hearing, and because Appellant did not have opportunity to respond, the Board's adoption of Appellee's argument was improper.

> 2.    *The Speaker or Display Are Not Endpoints of the Communication Environment*

It was a legal error for the board to construe "endpoint in the communication environment" as the speaker or display of Kim's TV system. Appx00023. Such construction ignores that the endpoint is in the communications environment. *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1371 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *SSI Techs., LLC v. Dongguan Zhengyang Elect. Mech. LTD,* 59 F.4th 1328, 1335 (Fed Cir. 2023) (Rejecting a claim construction which rendered terms superfluous).

The '664 patent identifies endpoints as including, for example, "VHF radios, UHF radios, PSTN telephones, IP phones, push-to-talk telephones, cellular telephones, laptops, desktop computers, personal digital assistants (PDAs), or any other suitable end-user device capable of exchanging audio or other data in the architecture." Appx00046, 2:54-58. The parties had agreed to the construction of an endpoint as an end-user device. Appx00012; Appx00380; Appx00463; Appx00622. To be an endpoint, a speaker or display must be an end-user device in the communication environment per the claimed language. *See*

25

Appx00046, 2:54-58 ("capable of exchanging audio or other data *in the architecture*.") (emphasis added).

The speaker and display in Kim do not exchange data with other devices within the communication environment. Instead, they receive data from other subcomponents of the TV. Appx01694, 7-12; Appx01694, 21-24; Appx01696, 13-17; Appx01702, 12-14. In other words, the speaker and the display of Kim's TV system are not end-user devices themselves. Appellant, Appellee, and the Board had all identified the TV system as the endpoint, not its subcomponents. Appx00022 ("As to Kim, Patent Owner concedes that its television is an end-user device or endpoint") (citing Appx00418); Appx00181; Appx00183-00184; Appx03657-03663, ¶¶140-145. The TV exchanges data with the communications environment through its receiver. Appx01688, 17-25 ("… the TV system displays the received emergency-warning broadcast signal received via a broadcast signal receiver…"). The Board mistakenly treats the TV system as encompassing both an endpoint and a communication network. Appx00022 ("Patent Owner concedes that [Kim's] television is an end-user device or endpoint"); Appx00023 ("We discern no basis for construing 'endpoint' as excluding the speaker or display of Kim's TV system"). It was improper for the Board to interpret the TV system subcomponents (e.g., the speaker or display) as an endpoint of the communication environment while also interpreting the TV system itself as an endpoint of the communication environment.

26

In light of the Board's improper construction of "an endpoint in the communication environment" the FWD should be reversed.

### a. The FWD's reliance on Dr. Shaffer's testimony is improper

In the FWD, the Board specifically referenced that "Patent Owner's declarant… testified on cross-examination that an endpoint could be a 'screen' or a 'speaker.'" Appx00023. At the oral hearing, Appellant explained that "Dr. Schaffer was asked a lot of questions outside the context of what the claims mean" and that there is not support for "separating out the endpoint to just be a speaker separated from the hardware associated with it[.]" Appx00618. Notwithstanding Appellant's argument, the Board failed to consider the context of Dr. Schaffer's deposition testimony. *See* Appx03053-03056.

First, the testimony provided by Dr. Schaffer was not an interpretation of Kim. Appx03053. Dr. Schaffer was asked a number of questions to identify endpoints in Figure 1 (reproduced below) of the '664 patent. *See* Appx03053-03056. For example, Dr. Shaffer was specifically asked if "[i]n this portion of Column 2 [of the '664 patent] there's reference to end-user devices at 40 and 50, right?" and if "[t]hose could be endpoint in the claim?" Appx03053. He was further asked if "elements 40 and 50 are examples of field equipment and element 24 is an example of end-user equipment, which resides in the control center." Dr. Schaffer identified the end-user devices 24, 40, and 50 such as the push-to-talk radios 40 as endpoints in Figure 1 of the '664 patent. Appx03053-03055. And more specifically, with respect to element 24, Dr. Schaffer noted that "[t]he element 24 includes two different things"

27

and clarified that endpoint 24 "includes, for example, a server… and the endpoint is the screen, maybe, that the user listen – is using. The end point may be a speaker or the microphone that the user is using. Servers usually would not be called endpoints." Appx03055-03056.



SERVER ADMINISTRATION CONSOLE

OPERATIONAL VIEW

POLICY ENGINE

FIG. 1

Appx00041, Fig. 1.

The specific portion of the deposition transcript Appellee and the Board rely on is an abstract question about what *could* be an endpoint, not in the context of any communications environment:

28

> Q      Okay. Understood.
> So your opinion is the server is not an endpoint, but the screen *could be* an endpoint or the speaker could be an end point or the microphone *could be* an end point?
> A      Yes, yes.

Appx03056 (emphasis added).  There is no basis to conclude that Dr. Schaffer was testifying that a speaker or display constitute endpoints for all implementations, especially in the context of the communication environment of claim 1.

Throughout this exchange, Dr. Schaffer emphasized the importance of the communication environment for determining what constituted an endpoint with respect to the '664 patent generally.  Appx03054.  For example, in the following exchange, Dr. Schaffer noted that the environment needed to be taken into account:

> Q      Right, right. In other words, the claim does not exclude using push-to-talk radios like those in 40 as the end point, correct?
> A      I mean, it includes it specifically. It is part of it, so.
> Q      Right. And that's what I'm trying to understand here. So lets --
> A      But -- I'm sorry, but it does mean that it must be there. *You know, it's IPICS environment*. So, for example, I can have environment in which there is no IP phone and it still operates.

Appx03054 (emphasis added).

Further, the qualifying language in Dr. Schaffer's testimony is consistent with this point.  He noted that that management center 24 includes a server, a screen, and a speaker and that servers "*usually* would not be called end points" but that the "end point *may* be a speaker or the microphone that the user is using" or "the end point is the screen, *maybe*, that the user [is using.]"  *Id*. (emphasis added).  Taking the communication environment into

29

consideration when determining the endpoint is consistent with the '664 patent. Appx00046, 2:53-58 ("These devices (referred to as 'endpoint' as used herein in this document) may include VHF radios, UHF radios, PSTN telephones, IP phones, push-to-talk telephones, cellular telephones, laptops, desktop computers, personal digital assistants (PDAs), or any other suitable end-user *device capable of exchanging audio or other data in the architecture*.") (emphasis added); Appx00049, 8:36-39 ("…endpoint *in the communication environment*.") (emphasis added).

It is clear, taking the context of the questioning into consideration, that the environment the device occupies must be taken into consideration to determine if the device constitutes an endpoint. In other words, Dr. Schaffer's testimony that the speaker and display identified in the '664 patent could be endpoints should not be applied to Kim without consideration of whether they are endpoints in the communication environment.

This was the exact issue the Appellant warned the Board about at the oral hearing. When asked to respond to "evidence where Dr. Schaffer admitted than an endpoint can be a speaker or a microphone" Appellant responded:

> I think there are a couple of things there. I think Dr. Schaffer was asked a lot of questions outside of the context of what the claims mean. And I think if you read through his deposition, that you'll see he was badgered quite extensively and was quite confused about what they were asking about at the deposition. … And so, I think an endpoint is an endpoint. Like, *I don't think you can separate out the speaker from the other parts of the hardware.* I think his point was that, you know, I'll get back to what he was asked at his deposition, which is how can you monitor an alert in a media stream if there is no media stream to begin with. And I think that's the argument that I think carries the most weight. *But as far as separating out the endpoint to just be a speaker*

30

*separated from the hardware associated with it, I don't think there's any support for that in the record.*

Appx00618 (emphasis added); *see also*, Appx00630-00631.   Moreover, Appellant raised

that the context in which the question was asked was in the context of the '664 patent's Figure

1, not regarding Kim:

> But more importantly, if you go back to **Figure 1, for example, and box 24, which Petitioner pointed to, examples of endpoints are, for example, telephones.** And there's no example that says the endpoint is just the speaker of the telephone and not the hardware itself. And so, that's the point I think we get to with Kim, is Kim's endpoint is a television. It's not a speaker and then there's a separate box for the other equipment itself. So, I think, you know, the expert's testimony is what it is. It's not the spec. And so, we'll go back to the specification and the examples of things But there's nothing in the specification that would say that speaker by itself, just the speaker removed from the rest of the hardware and the radio isn't it.

Appx00619-00620 (emphasis added).

The Board accordingly misconstrued Dr. Shaffer's deposition to rely on Kim's TV

speaker constituting an endpoint with respect to claim 1.  The Board's construction of

endpoint with respect to the communication environment of claim 1 is therefore improper.

For at least this reason, the judgment of the Board should be reversed or, at a minimum,

remanded to the Board for further consideration.

> **C.    The Board Committed Legal Error In Construing "elevating a priority of the media stream" As Changing Hardware Settings Of How The Media Stream Is Ultimately Displayed and/or Emitted from Kim's TV**

The Board committed legal error in construing "elevating a priority of the media

stream receiving the alert, such that an adjustment is made to how the media stream is

31

provisioned to an endpoint in the communication environment" as merely an adjustment in how the media stream is displayed and/or emitted from the TV. According to the Board:

> Kim discloses ***elevating a priority*** associated with the media stream receiving the alert (emergency-warning broadcast signal) such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment, specifically the speaker and the display of Kim's TV system. The adjustments disclosed by Kim are ***turning on the TV*** (which would include its display and speaker components), ***tuning to the prescribed channel*** (affecting both the display and speaker), ***increasing the volume output by the speaker***, and ***processing captions for the display***.

Appx00023 (citing Appx01687, 22-23, Appx01698, 7, Appx01728, Fig. 3) (emphasis added).

The Board mistakenly concludes that changes to hardware settings involved in the media streams are equivalent to elevating the priority of the media stream itself. This legal error provides an independent basis to overturn the Board's FWD.

### 1. The Claimed Adjustments are Made to How the Media Stream is Provisioned

Claim 1 of the '664 patent recites: "elevating a priority associated with the media stream receiving the alert, such that an adjustment is made to ***how the media stream is provisioned*** to an endpoint in the communication environment." Appx00049, 8:35-39 (emphasis added). The adjustments are specifically made to the provisioning of the media stream rather than the hardware settings used to display and/or emit the media stream from the TV to ensure the alert message is received. *See* Appx00047, 3:30-34.

32

In the example provided in the '664 patent, the user of the data endpoint listening to multiple media streams may reduce the channel volume with their radio settings so that the information cannot be heard. Appx00047, 3:34-55. So, to ensure the messages is heard the management center coordinates a suitable response autonomously when provisioning the media stream. Appx00047, 4:6-10. The specification provides examples of how this can be performed. *See e.g.,* Appx00046, 2:14-32; Appx47, 3:55-4:9. For example, the communication system may change the arrival direction of the media stream, or increase the volume of the prioritized media stream, marginalizing the media streams of other channels, or a combination of these example adjustments. Appx00047, 3:55-4:9. Interpreting this limitation to merely require adjustments in the way the data stream is ***displayed and/or emitted*** from Kim's novel TV completely ignores that the limitation is specifically about how the media stream itself is ***provisioned***.

### 2. *Kim Does Not Adjust How the Media Stream is Provisioned*

Kim does not adjust how the media stream is provisioned. Rather, after receiving the media stream, the television adjusts hardware settings for displaying and/or emitting the media stream, but does not make adjustments to the media stream itself.

Kim's novel television displays emergency-warning broadcast information. Appx01685, 3-9. The television is designed to display the emergency-warning program even when the television is off or viewing media from an external device (such as a VCR). Appx01686, 10-22. Figure 5 (reproduced below) depicts a block diagram of a TV having a

33

dedicated emergency-warning broadcast tuner. Appx01704, 7-8. This TV includes a first

broadcast signal receiver 10, second broadcast signal receiver 15, plurality of switches, and

a controller 70 which controls the overall operations of the TV system through a control

program data stored in a memory 85. Appx01695, 25, Appx01696, 1-17, Appx01704, 9-16.



Appx01730, Fig. 5.

The second broadcast signal receiver 15 is a receiver dedicated to receiving the

emergency-warning broadcast signal. Appx01704, 17-21. Meanwhile, the first broadcast

signal receiver 10 receives a predetermined selection broadcast signal. Appx01693, 24-25,

Appx01694, 1-3. The first audio switching unit 110 selects and outputs either an audio signal

34

from the external source (e.g., a VCR) or from the second broadcast signal receiver 15 according to a control signal from controller 70. Appx01705, 4-9. Likewise, the second audio switching unit 120 selects either the output signal from the first audio switching unit 110 or the audio from the first broadcast signal receiver 10. Appx01705, 9-12. The output of the second audio switching unit 120 is processed using the audio signal processor 40 and audibly output using the audio signal generator 50. Appx01705, 13-19. The audio signal processor 40 includes an amplifier that adjusts the volume of the audible sound based on a signal (1) the audio signal processor 40 receives from the controller. Appx01694, 24-25, Appx01695 1-4.

Similarly, the video signals from the first broadcast signal receiver 10, second broadcast signal receiver 15 and the external source device are selected using the first video switching unit 130 and second video switching unit 140, processed by the video signal processor 20, and output via a Cathode Ray Tube (CRT). Appx01705, 20-25; Appx01706, 1.

However, all of these adjustments are made to how the media stream is displayed and/or emitted, not how the media stream is provisioned. Kim's "emergency-warning broadcast signal is transmitted from the **predetermined** broadcast channel" and any adjustments are made after the data is decoded at the endpoint. Appx01688, 17-25 (emphasis added); Appx01710, 18-25; Appx01711, 1-20; Appx03624, ¶80; Appx03625, ¶84.

35

Figure 3 (reproduced below) illustrates a method for propagating the emergency-warning broadcast signal in a TV system. Appx01697, 21-22. In the first step, the controller of the TV determines if an emergency-warning broadcast signal has been detected. Appx01698, 7-12. If received, the signal is analyzed to determine whether there is an allowable error between the clock of the transmission and the clock of the system. Appx1698, 23-25, Appx01699, 1-3. If the information in the clocks match, and other received information matches the code in the television, the television will power on and increase the volume to the set levels determined by the broadcast center. Appx01699, 3-25, Appx01700, 1-11.

36

Fig.3



Appx01728, Fig. 3.

However, in this process, the media stream is merely received by the TV acting as an endpoint; any adjustments that occur in the media stream occur *after* the media stream has been provisioned and not to the media stream itself. Appx03657-03660, ¶¶141. In other words, the media stream is static. Appx03660-03661, ¶142. There is no discussion in Kim of how adjustments are made in the way the media stream is *provisioned* to an endpoint. *Id.*

37

Instead, the television receives information from the control center and changes hardware settings in the way the media stream is displayed and/or emitted. Appx01695, 13-25, Appx01696, 1-12. This is the exact issue that the '664 patent identified in the prior art. *see* Appx00046, 1:33-41 (the '664 patent describing the issues of static channel configurations in conventional systems).

Based on its plain and ordinary meaning, "elevating a priority associated with the media stream receiving the alert, such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment" is not disclosed by Kim, which merely alters the way in which the media stream is displayed and/or emitted from a TV. Accordingly the FWD should be reversed on at least this error alone.

## VIII.  CONCLUSION

The judgment of the Board should be reversed or, at a minimum, remanded to the Board for further consideration.

Dated: April 23, 2026                    Respectfully submitted,

                                         /s/ Jason A. Engel
                                         Jason A. Engel
                                         K&L Gates LLP
                                         70 W. Madison St., Suite 3300
                                         Chicago, IL 60602
                                         Phone: 312-807-4236
                                         Email: jason.engel@klgates.com

                                         Erik J. Halverson
                                         K&L Gates LLP
                                         4 Embarcadero Center
                                         San Francisco, CA 94111
                                         Phone: 415-882-8238
                                         Email: erik.halverson@klgates.com

                                         Nicholas F. Lenning
                                         K&L Gates LLP
                                         925 Fourth Avenue, Suite 2900
                                         Seattle, WA 98104
                                         Phone: 206-370-6685
                                         Email: nicholas.lenning@klgates.com

                                         COUNSEL FOR APPELLANT
                                         STA GROUP LLC

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Federal Circuit Rule 32(b) because this brief contains 7,602 words, excluding the parts of the brief exempted by <u>Federal Rule of Appellate Procedure 32(f)</u>.

2.    This brief complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> and the type-style requirements of <u>Federal Rule of Appellate Procedure 32(a)(6)</u> because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word in 14-point Times New Roman font.

Dated: April 23, 2026                    By:    <u>/s/ Jason A. Engel</u>
                                                      Jason A. Engel

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number**   2025-1784

**Short Case Caption**   STA Group LLC v. Motorola Solutions Inc.

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system.  See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e).  Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on  04/23/2026

by     ☐    U.S. Mail     ☐     Hand Delivery     ☑ Email     ☐ Facsimile
       ☐    Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Lauren J. Dreyer | lauren.dreyer@bakerbotts.com |
| Robert L. Maier | robert.maier@bakerbotts.com |
| Clarke Stavinoha | clarke.stavinoha@bakerbotts.com |
| Eliot D. Williams | eliot.williams@bakerbotts.com |
| Lori Ding<br>Katherine M. Burke | lori.ding@bakerbotts.com<br>katherine.burke@bakerbott.com |

☐     Additional pages attached.

Date: 04/23/2026

Signature:  /s/ Jason A. Engel

Name:    Jason A. Engel

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

| Description | Appendix Pages |
|---|---|
| Final Written Decision - 35 U.S.C. §318(a) IPR2023-01294, 3/14/2025 | Appx00001-Appx00037 |
| U.S. Patent No. 8,831,664 to Shaffer et al. 09/09/2014 | Appx00038-Appx00050 |

Trials@uspto.gov
571-272-7822

Paper 42

Date:  March 14, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

MOTOROLA SOLUTIONS, INC.,
Petitioner,

v.

STA GROUP LLC,
Patent Owner.

————————

IPR2023-01294
Patent 8,831,664 B2

————————

Before MICHAEL J. FITZPATRICK, DAVID C. McKONE, and
KEVIN C. TROCK, *Administrative Patent Judges*.

FITZPATRICK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2023-01294
Patent 8,831,664 B2

## I.    INTRODUCTION

Petitioner, Motorola Solutions, Inc., filed a Petition to institute an *inter partes* review of claims 1–20 of U.S. Patent No. 8,831,664 B2 ("the '664 patent") pursuant to 35 U.S.C. § 311(a).  Paper 1 ("Pet.").  Patent Owner, STA Group LLC, filed a Preliminary Response pursuant to 37 C.F.R. § 42.107(b).  Paper 8 ("Prelim. Resp.").  With our authorization, Petitioner filed a Preliminary Reply (Paper 10), and Patent Owner filed a Preliminary Sur-reply.  Paper 11.  We granted the Petition.  Paper 12 ("Inst. Dec.").

During the review, Patent Owner filed a Patent Owner Response to the Petition (Paper 19 ("PO Resp.")), Petitioner filed a Reply (Paper 26 ("Pet. Reply")), and Patent Owner filed a Sur-Reply (Paper 30 ("PO Sur-Reply")).  Petitioner also filed a Motion to seal and for entry of a protective order.  Paper 27 ("Motion").[1]  Additionally, with our authorization (*see* Paper 32), Petitioner filed a paper identifying what it asserts are new arguments improperly raised in Patent Owner's Sur-reply (Paper 33) and Patent Owner filed a response thereto (Paper 34).[2]  Oral hearing was held January 15, 2025.  A transcript of that hearing is of record in this case.  Paper 38 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6, and this Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and

---

[1] By separate Order, we grant the Motion.
[2] Petitioner identifies two such arguments.  Paper 33, 1–2.  The first argument concerns Ground 1 (*see id*. at 1), which, as explained below we do not reach.  The second argument concerns Ground 7 (see *id*. at 2), but is unpersuasive as discussed below.

2

IPR2023-01294
Patent 8,831,664 B2

arguments raised during the review.  For the reasons discussed below, we determine that Petitioner has proven, by a preponderance of the evidence, that claims 1–20 of the '664 patent are unpatentable.

### A. Related Matters

The parties identify the following district court proceeding involving the '664 patent, *STA Grp. LLC v. Motorola Solutions, Inc.*, No. 2-22-cv-00381 (E.D. Tex.).  Paper 9, 5; Paper 5, 1.

### B. Real Parties In Interest

Petitioner identifies itself, Motorola Solutions, Inc., as the real party in interest.  Paper 9, 5.

Patent Owner identifies itself, STA Group LLC, as the real party in interest.  Paper 5, 1.

### C. The '664 Patent

The '664 patent "relates . . . to a system and a method for providing channel configurations in a communications environment."  Ex. 1001, 1:18–21.  The '664 patent explains that in the prior art:

> Typically, a management center supports a plurality of channels, where less important channels are rendered to one ear, and channels that are more important are rendered to the other ear.  Universally, channels are statically configured, where the volume of each channel can be manually adjusted by an end user.  When important information needs to be broadcast, channels should be configured optimally.  If the channels are not fully utilized, then messages are not received by their intended recipients.

3

IPR2023-01294
Patent 8,831,664 B2

Ex. 1001, 1:33–42. Thus, according to the '664 patent, it was a challenge "to offer a system or a protocol that offers an effective coordination for channels in a communications environment." *Id.* at 1:42–46.

The '664 patent discloses a method of "monitoring a plurality of channels provisioned for an endpoint" and "reacting to an alert message by adjusting one of the channels for the endpoint." Ex. 1001, 2:11–14. Included among possible adjustments are the following: "increasing a volume associated with the channel receiving the alert message," "changing a spatial direction from which the alert message and an associated media stream are conveyed to the endpoint," "provision[ing] the alert message from a left ear to a right ear of an end user of the endpoint," "determining which is a primary channel of the channels and provisioning the alert message to the primary channel of the endpoint," "turning a volume down on every other channel besides a channel being used for the alert message," "using out-of-band signaling," and "sending the alert message until feedback has been received, which indicates that the alert message has been acknowledged by the endpoint." *Id.* at 1:15–32.

Alert messages are "meant to connote any type of message or signal that was intended for one or more end users" and "may inform the end users . . . of some situation, or alternatively simply convey some information from a sender." Ex. 1001, 7:41–46. Alert message could even include "simple conversational exchanges and/or simple correspondence." *Id.* at 7:46–48.

Figure 5 is reproduced below.

4

IPR2023-01294
Patent 8,831,664 B2



FIG. 5

Figure 5, reproduce above, shows "a simplified flowchart illustrating an example scenario involving communication system 10" and shows adjustments made at steps 104 and 106 in response to receiving an alert at step 102.  Ex. 1001, 7:60–61.

The '664 patent was filed on August 16, 2011, and claims priority as a continuation of an application filed December 19, 2008.  *Id.*, codes (22), (63).  Thus, the earliest possible effective filing date for the challenged claims is December 19, 2008.

5

IPR2023-01294
Patent 8,831,664 B2

### D. The Challenged Claims

*Inter partes* review was sought and instituted for claims 1–20, which are all of the claims of the '664 patent.  Pet. 2; Inst. Dec. 2.  Of these, claims 1, 11, and 16 are independent.  Claim 1 is reproduced below.

> 1.  A method, comprising:
>
> [a] monitoring media streams associated with channels in a communication environment;
>
> [b] receiving an alert in one of the media streams; and
>
> [c] elevating a priority associated with the media stream receiving the alert, [c'] such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment.

Ex. 1001, 8:32–39.[3]  Independent claim 11 is directed to "[n]on-transitory readable media that includes code for execution and when executed by a processor operable to perform operations comprising" [a], [b], and [c].  *Id.* at 8:65–9:5.  Independent claim 16 is directed to "[a]n apparatus, comprising: a memory element; a processor; and a management element stored in the memory element and configured to interface with the processor such that the apparatus is configured for" performing [a], [b], and [c].  *Id.* at 9:21–10:8. Independent claims 11 and 16 are similar to claim 1, but they do *not* recite the further limitation [c'], i.e., "such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment."

---

[3] The Petition refers to what we have labeled limitations [c] and [c'] as simply limitation [c].  *See, e.g.*, Pet. 32–33.  As discussed below, limitation [c'] appears in claim 1 but not in the other independent claims being challenged, i.e., claims 11 and 16.  Hence, we label limitation [c'] separately.

6

IPR2023-01294
Patent 8,831,664 B2

*E. Asserted Patents and Printed Publications*

| Name | Reference | Ex. # |
|------|-----------|-------|
| Downs | US 5,754,960, issued May 19, 1998 | 1004 |
| EDACS | *A System and Standards Definition for a Digital Land Mobile Radio System*, TIA/EIA TELECOMMUNICATIONS SYSTEMS BULLETIN (Nov. 1998) | 1005 |
| Hancock | US 2006/0147028 A1, published July 6, 2006 | 1006 |
| Reich | US 2007/0197248 A1, published Aug. 23, 2007 | 1007 |
| Kim | WO 2004/034350 A1, published Apr. 22, 2004 | 1008 |
| Ishibashi | JP 2006/340164 A, published Dec. 14, 2006 | 1009[4] |
| Goss | US 7,330,693 B1, issued Feb. 12, 2008 | 1010 |

In addition to these references, Petitioner relies on a declaration by David Hilliard Williams. Ex. 1002. Patent Owner relies on a declaration by Shmuel Shaffer, Ph.D. Ex. 2005.

---

[4] Exhibit 1009 includes the actual Japanese published application (pages 1–13), followed by an English translation thereof (pages 14–41), followed by a certification of the translation (page 42).

7

IPR2023-01294
Patent 8,831,664 B2

*F. The Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| Ground No. | Claim(s) Challenged | 35 U.S.C. § | Basis |
|---|---|---|---|
| 1 | 1–6, 8, 9, 11–20 | 103(a)[5] | Downs, EDACS |
| 2 | 1–6, 8, 9, 11–20 | 103(a) | Downs, EDACS, Childress |
| 3 | 3–5, 13, 14, 18, 19 | 103(a) | Downs, EDACS, Hancock |
| 4 | 3–5, 13, 14, 18, 19 | 103(a) | Downs, EDACS, Childress, Hancock |
| 5 | 7, 10 | 103(a) | Downs, EDACS, Reich |
| 6 | 7, 10 | 103(a) | Downs, EDACS, Childress, Reich |
| 7 | 1, 2, 6–9, 11, 12, 15–17, 20 | 103(a) | Kim |
| 8 | 3–5, 13, 14, 18, 19 | 103(a) | Kim, Ishibashi |
| 9 | 10 | 103(a) | Kim, Goss |

Pet. 2. As discussed below, Ground 7, 8, and 9 are persuasive on all challenged claims, and, thus, we need not and do not reach Grounds 1–6.

## II.   ANALYSIS

*A. Obviousness Generally*

A claim is unpatentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a

---

[5] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, which was enacted September 16, 2011, amended 35 U.S.C. §§ 102 and 103. AIA § 3(b)–(c). Those amendments became effective eighteen months later on March 16, 2013. *Id*. at § 3(n). Because the application from which the '664 patent issued was filed before March 16, 2013, any citations herein to 35 U.S.C. §§ 102 and 103 are to their pre-AIA version. *Id*. at § 3(n)(1).

8

IPR2023-01294
Patent 8,831,664 B2

whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). "Obviousness is a question of law based on underlying facts." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1167 (Fed. Cir. 2015). The underlying facts include "(i) the scope and content of the prior art, (ii) the differences between the prior art and the claimed invention, (iii) the level of ordinary skill in the field of the invention, and (iv) any relevant objective considerations of nonobviousness." *Id*. (citing *Graham v. John Deere of Kan. City*, 383 U.S. 1, 17–18 (1966)).[6] An additional underlying fact is whether there was a reason to combine prior art teachings when so asserted. *Id*.; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–19 (2007) ("[I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does . . . because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."). Further, an obviousness determination based on combining prior art references, as is the case with some of Petitioner's Grounds, "requires not only the existence of a motivation to combine elements from [the] different prior art references, but also that a skilled artisan would have perceived a reasonable expectation of success in

---

[6] "[E]vidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). The record before us, however, lacks any secondary considerations evidence.

9

IPR2023-01294
Patent 8,831,664 B2

making the invention via that combination." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006).

### B. *Level of Ordinary Skill in the Art*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person having ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

Petitioner proposes that a person of ordinary skill in the art of the '664 patent "would have had a bachelor's degree in computer science, electrical engineering, or a similar field, and would have had approximately two years industry experience in networking or communication systems." Pet. 5; *see also id.* ("A person with less or different education but more relevant practical experience, or vice versa, may also meet this standard."). Patent Owner very similarly proposes that the skilled artisan "would have [had] a bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and two to three years [of] experience in designing or developing telecommunication systems." PO Resp. 24–25 (citing Ex. 2005 ¶42).

Both of the parties' proposals as to the level of ordinary skill in the art are consistent with the disclosure of the '664 patent and the asserted prior

10

IPR2023-01294
Patent 8,831,664 B2

art.  The distinction between the parties' proposals is minimal and would not change the outcome of this Decision.  Thus, we adopt and apply Patent Owner's proposal.

### C.  Claim Construction

The challenged claims should be read in light of the specification, as they would be interpreted by one of ordinary skill in the art.  *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010).  Thus, we generally give claim terms their ordinary and customary meaning.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question." (internal quotation marks omitted)); *see also* 37 C.F.R. § 42.100(b) (stating that claims are construed in IPRs according to the same standard as used in federal court).

Petitioner does not propose a construction of any claim terms.  Pet. 5–6.

Patent Owner proposes that we make three express constructions consistent with what Patent Owner represents the parties to have agreed to in district court in *STA Grp. LLC v. Motorola Solutions, Inc.*, No. 2-22-cv-00381 (E.D. Tex.).  PO Resp. 10–11 (citing Ex. 2004, 16).[7]

First, Petitioner argues that the steps of claim 1 "must be performed in the recited order," as agreed to in district court.  *Id*. at 10 (citing Ex. 2004,

---

[7] Exhibit 2004 is a "CLAIM CONSTRUCTION ORDER" entered June 3, 2024 by the Court in *STA Grp. LLC v. Motorola Solutions, Inc.*, No. 2-22-cv-00381 (E.D. Tex.) regarding claim terms of multiple asserted patents including the '664 patent.

11

IPR2023-01294
Patent 8,831,664 B2

16).  We generally agree, with the one caveat acknowledged by counsel for Patent Owner during the hearing.  The caveat is that, although step [a] must be performed before step [b], it is within the scope of claim 1 if step [a] continues to be performed even after step [b] begins.  Tr. 25:25–26:3 (Mr. Engel: "Well, I think in practicality, there would always be monitoring because there's multiple media streams.  So, you could have multiple alerts come in and the system could decide which one is more important.  So, I don't think you stop monitoring per se.").  We agree that continued performance of step [a], even after step [b] begins, is within the scope of claim 1.

Second, Patent Owner proposes that "endpoint" means "end-user device," as agreed to in district court.  PO Resp. 10 (citing Ex. 2004, 16).  We adopt this construction.  However, as will become evident below, this construction does little to address the actual dispute between the parties regarding application of "endpoint" to the prior art asserted in Ground 7 (Kim).

Third, Patent Owner proposes that "media stream" means "audio or video or both, which may include associated data," as adjudicated in district court.  PO Resp. 11 (citing Ex. 2004, 42).  We adopt this construction.

### D. Grounds 1–6

As will be discussed below, Petitioner shows that all of the challenged claims are unpatentable under Grounds 7, 8, and 9.  Thus, we need not reach Grounds 1 through 6.  *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (holding that a petitioner "is entitled to a final written decision addressing all of the claims it has challenged"); *Boston Sci. Scimed, Inc. v.*

12

IPR2023-01294
Patent 8,831,664 B2

*Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (nonprecedential)
(stating that the "Board need not address issues that are not necessary to the
resolution of the proceeding," such as "alternative arguments with respect to
claims [the Board] found unpatentable on other grounds").

### E. Ground 7 (Kim)

Petitioner's Ground 7 contends that claims 1, 2, 6–9, 11, 12, 15–17,
20 would have been obvious over Kim. Pet. 2. The Petition summarizes
Kim (Pet. 16–19) and explains how it teaches or renders obvious the subject
matter of the challenged claims (*id.* at 66–80). We address each claim
below. We likewise summarize Kim before addressing each challenged
claim.

### 1. Summary of Kim (Ex. 1008)

Kim is titled "Television Set and Method for Notifying a Disaster
Situation." Ex. 1008, code (54). Kim was filed October 9, 2003, and
published April 22, 2004. *Id.*, codes (22), (43). Thus, Kim is prior art to the
challenged claims under 35 U.S.C. §§102(a), (b), and (e). *See* Ex. 1001,
code (63) (identifying December 19, 2008, as the earliest possible effective
filing date of the challenged claims).

A stated objective of Kim is to "provide a television system for
propagating emergency-warning broadcast signals to individual houses on
the condition that the occurrence of a disaster or calamity has been expected,
and a method for propagating emergency-warning broadcast signals for use
in the same television system." Ex. 1008, 2:3–9.

In one embodiment, Kim discloses using two signal receivers
simultaneously, whereby one signal receiver facilitates regular television

13

IPR2023-01294
Patent 8,831,664 B2

viewing while the other monitors a dedicated emergency-warning broadcast station.  *Id.* at 23:2–18, Fig. 5.

Figure 5 of Kim is reproduced below.



Figure 5, reproduced above, shows "a block diagram illustrating a TV system having a dedicated emergency-warning broadcast tuner."  Ex. 1008, 20:7–8.  The system includes first and second broadcast signal receivers 10 and 15.  *Id*. at 20:9–10.  "[T]he second broadcast signal receiver 15 is a receiver for receiving only the emergency-warning broadcast signal, includes a tuner and an IF (Intermediate Frequency) processor, and performs a channel selection control operation using the controller 70."  *Id*. at 20:17– 21.  "The second broadcast signal receiver 15 is fixed to a prescribed channel to receive only the emergency-warning broadcast signal."  *Id*. at 20:21–24.

14

IPR2023-01294
Patent 8,831,664 B2

Kim explains:

> Although the controller 70 receives other channels other than the emergency-warning broadcast channel from the first broadcast signal receiver 10, if the emergency-warning broadcast signal is suddenly propagated, the controller 70 can transmit the emergency-warning broadcast signal using the second broadcast signal receiver 15 and the emergency-warning broadcast signal divider/processor 60, and can determine whether a real-time emergency-warning broadcast operation associated with the corresponding area is performed. Therefore, the emergency-warning broadcast signals propagated over the second broadcast signal receiver can be propagated to TV viewers by means of individual switching units 110, 120, 130, and 140.

*Id.* at 23:2–14.  Thus, when an emergency-warning broadcast signal is received in Kim, it is processed by the "emergency-warning broadcast signal divider/processor," and "[t]he TV system's controller 70" can carry out certain functions in regards to the emergency warning broadcast, including turning the TV on if off, turning to the prescribed channel, increasing the volume, and processing captions for display.  *Id.* at 3:22–23, 14:7, Fig. 3.[8]

### 2.  Claim 1

Claim 1 is a method claim comprising three steps, which steps the Petition labels [a] through [c].  We follow suit in our analysis below although we separately label and discuss the further limitation of step [c'], reciting that "an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment."

---

[8] Figure 3 of Kim, not reproduced here, "is a flow chart illustrating operations for use in the TV system in accordance with preferred embodiments."  Ex. 1008, 5:12–14.

15

IPR2023-01294
Patent 8,831,664 B2

    a)  [a] "monitoring media streams associated with channels in a
communication environment"

Petitioner argues that Kim performs this step, as its two broadcast signal receivers (10 and 15) enable the controller (70) to "***monitor***[] individual channels." Pet. 67 (citing Ex. 1008, 14:7–12, Fig. 5). Petitioner points out that, in Kim, the monitored channels "carry 'digital broadcast signal[s]' 'composed of data streams,' divided into 'predetermined units (i.e., packet[s]),' and transmitted in 'the divided data sections.'" *Id.* (quoting Ex. 1008, 29:20–24). In other words, Kim's digital broadcast signals are the recited "media streams associated with channels," and they are monitored by the controller.

Patent Owner does not dispute that Kim teaches step [a]. *See* PO Resp. 47–57. We are persuaded that it does.

    b)  [b] "receiving an alert in one of the media streams"

Petitioner argues that Kim performs this step, as Kim explicitly states "controller 70 receives an emergency-warning broadcast signal," which is added in packets to the "digital broadcast signal" (media stream). Pet. 68 (citing Ex. 1008, 14:13–14, 29:30–21, Fig. 1). Petitioner further points out that, in Kim, "[a]n emergency-warning broadcast starts when the 'emergency-warning broadcast signal is suddenly propagated' in the media stream, beginning with a 'TV automatic emergency-warning broadcast start' code." *Id.* at 68–69 (citing Ex. 1008, 7:7–9, 23:4–5). In other words, Kim's start information/code serves as the "alert" recited in the claim. *See* Ex. 1008, 7:7–9 ("TV emergency-warning broadcast *start information* indicates a start time of the TV emergency-warning broadcast." (emphasis added)); *see also id.* at 23:15–18 ("Although the TV viewer currently views

16

IPR2023-01294
Patent 8,831,664 B2

and listen[s] to a TV program of another channel, he or she can quickly receive the emergency-warning broadcast signal via a dedicated emergency-warning broadcast tuner.").

Patent Owner does not dispute that Kim teaches step [b].  *See* PO Resp. 47–57.  We are persuaded that it does.

### c)  [c] "elevating a priority associated with the media stream receiving the alert, [c'] such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment"

Petitioner argues that Kim performs this step, including the further limitation [c'], regardless of "whether or not the TV is off, muted, or 'the TV viewer currently views and listen[s] to a TV program of another channel'."  Pet. 70 (quoting Ex. 1008, 29:16–19).  For example, Petitioner points out that, when an alert is received, the controller "powers the TV system on, converts a system operation mode into a TV viewing mode, and controls the TV system to output broadcast data of the prescribed emergency warning broadcast channel in the form of AV data."  Pet. 70–71 (quoting Ex. 1008, 26:10–14 (Petitioner's bracketed alterations omitted)); *see also* Ex. 1008, 3:13–14 ("Therefore, although the TV system is powered off, it can be automatically powered on when receiving an emergency-warning broadcast signal."), Fig. 3 (flowchart step "V").  Also, the controller can "output[] a volume control signal to increase a volume level of the TV system."  Ex. 1008, 27:16–17 (cited at Pet. 71), Fig. 3 (flowchart step "VIII").  Further, if a viewer is watching a different channel when the alert is received, "the controller selects a channel of a broadcast signal receiver in order to receive a broadcast signal of a predetermined emergency-warning broadcast channel in a power-supply standby mode and a video play mode."  *Id.* at 4:12–16;

17

IPR2023-01294
Patent 8,831,664 B2

*see also id*. at Fig. 3 (flowchart step "VII"), 23:15–18 ("Although the TV viewer currently views and listen[s] to a TV program of another channel, he or she can quickly receive the emergency-warning broadcast signal via a dedicated emergency-warning broadcast tuner.").

Patent Owner argues that "*Kim's* system does not 'elevate a priority associated with the media stream' nor does Kim adjust 'how the media stream is provisioned **to an endpoint**.'" PO Resp. 48 (quoting claim 1). This is so, according to Patent Owner, because "*Kim* is a television endpoint that **reacts** to received broadcast television signals by adjusting endpoint settings; *Kim* does not have any control over the broadcast television signals themselves and how the broadcast signals are provisioned **to** the endpoint (the television)." *Id*.; *see also id*. at 49 ("*Kim* simply adjusts the settings of its endpoint (*i.e.*, the television)."). Patent Owner elaborates as follows:

> *Kim's* system simply (1) receives a broadcast signal at the television; (2) detects the inclusion of an emergency-warning broadcast signal; and (3) powers on the television (or adjusts a volume of the television or channels a television channel) when predetermined registration information is detected from the emergency-warning broadcast signal. Ex. 1008, 4:1–12; Ex. 2005, ¶¶142–143. In other words, *Kim* describes an endpoint that receives broadcast data, does not elevate a priority associated with the broadcast data, and then simply makes adjustments to itself in response to receiving the broadcast data.

PO Resp. 51–52. Similarly, at the hearing, counsel for Patent Owner argued the following:

> Kim is a specialized television. It is a television that listens for an alert, and it is capable of displaying that alert and displaying at a certain volume level. Kim is not the embodiment of the '664 at all. The '664 is designed so that you can implement this at a centralized location and not have to have all those fire departments buy all new radios. That's exactly what the

18

IPR2023-01294
Patent 8,831,664 B2

> embodiment of the '664 is. Do this at a centralized location or multiple centralized locations, but don't force those police departments to go out and buy all new radios for all of their officers. So, Kim is the example where you'd have to buy all new radios. And I think the other important point about Kim is, Kim is the endpoint. It's one endpoint that receives these audio or video determinations, and then it turns on or changes the volume, but it doesn't actually change anything about the media stream.

Tr. 29:15–30:2.

Patent Owner's arguments are not persuasive because they are not commensurate with the claim language. There is nothing recited in the claim about doing something *at a centralized location*, as Patent Owner's arguments imply. Claim 1 recites three steps but does not specify the structure that performs the steps or where that structure is located. There is no valid basis for construing claim 1 to require performance of any of its steps at a centralized location.

In an attempt to draw a contrast with Kim, Patent Owner cites an embodiment described in the '664 patent, in which "the communication system includes an IP network 20 coupled to a UMS element," wherein the "UMS [element] controls the relative volume of each media stream, which are [sic] streamed to the management center." PO Resp. 50 (citing Ex. 1001, 2:37–40, 5:36–52). In that embodiment, the '664 patent explicitly states that "the provisioning is being done **externally**, and the individual endpoints do not have to be capable of managing these alert messages." *Id*. at 50–51 (quoting Ex. 1001, 5:50–52). "By contrast, [Patent Owner argues,] *Kim's* television is an endpoint that does not adjust how a media stream is provisioned to either itself or other endpoints." *Id*. at 51.

19

IPR2023-01294
Patent 8,831,664 B2

We are not persuaded by this argument because, unlike the cited embodiment from the specification, claim 1 does not specify that the media stream is provisioned *externally*. Further, as Petitioner points out, the fact that the '664 patent describes an embodiment in which "the provisioning is being done externally, and the individual endpoints do not have to be capable of managing these alert messages," (Ex. 1001, 5:50–52), does not support limiting the claims to that embodiment, as would be the case with Patent Owner's construction. Pet. Reply. 20–21. We agree with Petitioner. That the specification describes an embodiment in which "the provisioning is being done externally" (Ex. 1001, 5:50–52), suggests that a generic reference to provisioning (or "is provisioned," as claim 1 recites) would not be limited to provisioning *externally*. *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel.").

In sum, we are not persuaded by Patent Owner's argument that claim 1 requires an adjustment made to how the media stream is provisioned *externally* to an endpoint in the communication environment. Such a construction is inconsistent with the broader language recited in claim 1.

We now turn to Patent Owner's related argument about the meaning of "endpoint" and its application to Kim. Implicitly construing the claim language, Patent Owner argues that, in claim 1, "[b]ecause the adjustment is made to how the media stream is provisioned *to* the endpoint, the adjustment must occur before the endpoint receives the media stream. Otherwise, the system could not adjust how the media stream is provisioned to the endpoint." PO Resp. 50 (citing Ex. 2005 ¶¶144–145). Patent Owner argues

20

IPR2023-01294
Patent 8,831,664 B2

that the television in Kim is the endpoint and, thus, any adjustment Kim does in response to an alert it receives would not be an adjustment "made to how the media stream is provisioned to an endpoint in the communication environment," as recited in claim 1. *See, e.g.*, PO Resp. 48 ("*Kim* is a television endpoint that ***reacts*** to received broadcast television signals by adjusting endpoint settings; *Kim* does not have any control over the broadcast television signals themselves and how the broadcast signals are provisioned ***to*** the endpoint (the television)."), 49–50 ("Because *Kim's* television does not transmit the television broadcast signal to other endpoints, in essence, the Petition contends that the television's controller adjusts how the broadcast media is provisioned to itself."); Tr. 32:19–21 ("[T]he endpoint in Kim is the television, and the thing doing all of the alleged steps in Kim would be the television. So, it's not provisioning it to an endpoint. It's receiving something and displaying it differently.").

All of these arguments, however, are premised on an erroneous construction of claim 1 as well as an erroneously simplistic view of Kim's television.

As to the former, Patent Owner argues that, "[b]ecause the adjustment is made to how the media stream is provisioned ***to*** the endpoint, the adjustment must occur before the endpoint receives the media stream." PO Resp. 50 (underlining added). We agree with this argument in so far as step [b] (the "receiving" step) must be performed ahead of step [c] (the "elevating" step). However, we disagree with Patent Owner's argument that step (b) specifies *what* receives the media stream, let alone that it be the same "endpoint" that is recited in step (c). In other words, there is no requirement in claim 1 for an adjustment to be made to how the media

21

IPR2023-01294
Patent 8,831,664 B2

stream is provisioned to an endpoint that has already received the media stream.  Rather, claim 1 encompasses an adjustment that is made to how the media stream is provisioned to *any* endpoint in the communication environment.

As to Kim, Patent Owner concedes that its television is an end-user device or endpoint.  *See* PO Resp. 48 ("*Kim* is a television endpoint.).  However, Patent Owner provides an erroneously simplistic view of the television as being a figurative black box.  In reality, Kim describes a "TV system" that comprises numerous components, with media streams being received by certain components and media streams being provisioned to certain other components.  Ex. 1008, 5:18.  For example, Figure 5 of Kim, which is reproduced above in section II.E.(1), includes first and second broadcast signal receivers 10 and 15 for receiving television broadcast signals, including emergency-warning broadcast signals.  *Id*. at 20:9–14, Fig. 5.  Kim's TV system also includes controller 70, which makes adjustments to how media streams are provisioned to audio signal generator 50 and video signal generator 30.  Kim teaches that "the emergency-warning broadcast signals propagated over the second broadcast signal receiver 15 can be propagated to TV viewers by means of individual switching units 110, 120, 130, and 140."  Ex. 1008, 23:11–14.  Specifically, they are propagated to viewers visually via a display (e.g., cathode ray tube) and audibly via a speaker.  *See, e.g., id*. at 10:19–20 ("The video signal generator 30 includes a CRT (Cathode Ray Tube) driver and a CRT."), 10:21–24 ("An audio signal processor 40 processes and outputs the audio signal separated by the broadcast signal receiver 10 in the form of predetermined R/L signals transmittable over a speaker.").

22

IPR2023-01294
Patent 8,831,664 B2

We discern no basis for construing "endpoint" as excluding the speaker or display of Kim's TV system.  Indeed, Patent Owner's declarant, who is one of the two named inventors of the '664 patent, testified on cross-examination that an endpoint could be a "screen" or a "speaker."  Ex. 1042, 75:5–15.[9]

Kim discloses elevating a priority associated with the media stream receiving the alert (emergency-warning broadcast signal) such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment, specifically the speaker and the display of Kim's TV system.  The adjustments disclosed by Kim are turning on the TV (which would include its display and speaker components), tuning to the prescribed channel (affecting both the display and speaker), increasing the volume output by the speaker, and processing captions for the display. Ex. 1008, 3:22–23, 14:7, Fig. 3.

We have reviewed both parties' arguments and evidence, and we determine that Petitioner has proven, by a preponderance of the evidence, that claim 1 is unpatentable as obvious over Kim.

### 3.  Independent Claims 11 and 16

Independent claims 11 and 16 are similar to claim 1, except they lack a limitation [c'].  Ex. 1001, 8:65–9:5 (claim 11), 9:21–10:8 (claim 16). Other than generic computer components recited in claim 16, claims 11 and

---

[9] During the hearing, counsel for Patent Owner suggested that Mr. Shaffer was "confused" about the question that led to his testimony that an endpoint could be a speaker or a screen.  Tr. 35:1–16.  We do not find that explanation sufficient to ignore or discount Mr. Shaffer's clear testimony that screens and speakers can be endpoints.  Ex. 1042, 75:5–15.

23

IPR2023-01294
Patent 8,831,664 B2

16 do not include any subject matter beyond that which is recited in claim 1. In other words, claims 11 and 16 are broader than claim 1. Petitioner argues that claims 11 and 16 are unpatentable over Kim for the same reasons claim 1 is. *See* Pet. 77–79. Patent Owner does not present any arguments for claims 11 and 16 being patentable over Kim beyond what it argues unpersuasively for claim 1.

Accordingly, for essentially the same reasons as for claim 1, we determine that Petitioner has proven, by a preponderance of the evidence, that claims 11 and 16 are unpatentable as obvious over Kim.

### 4. Dependent Claims 2, 6–9, 12, 15, 17, and 20

These claims all depend directly from one of claims 1, 11, or 16. Ex. 1001, 8:40–10:22. We address each below.

### a) Claim 2

Claim 2 recites: "The method of claim 1, wherein elevating the priority comprises increasing the volume of the media stream receiving the alert." Ex. 1001, 8:40–42. Petitioner asserts that this feature is satisfied by Kim's teaching of increasing the volume on the television speaker when an emergency-warning broadcast signal is being broadcast, which feature we have already discussed above. *See* Pet. 72–73 (referring back to its analysis for claim 1); *see also* Pet. 71 (citing Ex. 1008, 27:16–17, Fig. 3). We are persuaded that Kim teaches such a feature.

Patent Owner does not present any arguments as to claim 2 beyond those presented for claim 1. PO Resp. 47–57.

Petitioner has shown by a preponderance of the evidence that claim 2 would have been obvious over Kim.

24

IPR2023-01294
Patent 8,831,664 B2

### b) Claim 6

Claim 6 recites:  "The method of claim 1, wherein elevating the priority includes identifying a primary channel and rendering the alert message to the primary channel."  Ex. 1001, 8:53–55.  Petitioner asserts that this feature is taught by Kim in that, "even if 'the TV viewer currently views and listen[s] to a TV program of another channel, he or she can quickly receive the emergency-warning broadcast signal via a dedicated emergency-warning broadcast tuner.'"  Pet. 73–74 (quoting Ex. 1008, 29:16–19).  For example, as argued by Petitioner, "[i]f the channel 's' starts broadcasting an emergency-warning broadcast program' while a viewer is watching 'a TV program of the channel 'r', the broadcasting station changes the channel code 'r' to the other channel code 's' in such a way that it can compulsorily control the TV viewer of the channel [']r' to view the emergency-warning broadcast program of the channel 's'."  *Id*. at 74 (quoting Ex. 1008, 30:4–11).  We are persuaded that Kim teaches such a feature.

Patent Owner does not present any arguments as to claim 6 beyond those presented for claim 1.  PO Resp. 47–57.

Petitioner has shown by a preponderance of the evidence that claim 6 would have been obvious over Kim.

### c) Claim 7

Claim 7 recites:  "The method of claim 1, wherein elevating the priority includes turning a volume down on media streams not receiving the alert."  Ex. 1001, 8:56–58.  Petitioner asserts that this feature is satisfied by Kim's changing of "the channel code 'r' to the other channel code 's' . . . to view the emergency-warning broadcast program," which "effectively turn[s]

25

IPR2023-01294
Patent 8,831,664 B2

the volume of channel 'r' to zero." Pet. 74 (quoting Ex. 1008, 30:4–13). We are persuaded that Kim teaches such a feature.

Patent Owner does not present any arguments as to claim 7 beyond those presented for claim 1. PO Resp. 47–57.

Petitioner has shown by a preponderance of the evidence that claim 7 would have been obvious over Kim.

### d) Claim 8

Claim 8 recites: "The method of claim 1, wherein the alert is received in a header of a packet of the media stream." Ex. 1001, 8:59–60. Petitioner asserts that this feature is satisfied by Kim's teaching of "an 'emergency-warning broadcast signal' broken into its 'predetermined units (i.e., packets)'" as illustrated in Figure 1 of Kim. Pet. 75 (citing Ex. 1008, 7:7–9, 3:21–4:3, 29:20–21, Fig. 1). Petitioner further explains that one of the predetermined units contains an "emergency-warning broadcast start code" (the alert) in a header packet, which indicates an emergency-warning broadcast in a digital broadcast signal composed of data streams. *Id*. at 76 (citing Ex. 1008, Fig. 1). We are persuaded that Kim teaches such a feature.

Patent Owner does not present any arguments as to claim 8 beyond those presented for claim 1. PO Resp. 47–57.

Petitioner has shown by a preponderance of the evidence that claim 8 would have been obvious over Kim.

### e) Claim 9

Claim 9 recites: "The method of claim 1, wherein the alert is received in a control packet of the media stream." Ex. 1001, 8:61–62. Petitioner asserts that this feature is satisfied by Kim because the "alert packet contains

26

IPR2023-01294
Patent 8,831,664 B2

'data with emergency-warning broadcast control information.'"  Pet. 76 (quoting Ex. 1008, 4:2–3).  Petitioner also points out that Kim illustrates controls packets as "control codes" in Figure 1.  *Id*. (citing Ex. 1008, Fig. 1). We are persuaded that Kim teaches such a feature.

Patent Owner does not present any arguments as to claim 9 beyond those presented for claim 1.  PO Resp. 47–57.

Petitioner has shown by a preponderance of the evidence that claim 9 would have been obvious over Kim.

### f)  Claims 12 and 17

Claims 12 and 17 depend, respectively, from independent claims 11 and 16.  Ex. 1001, 9:6–8 (claim 12), 10:9–11 (claim 17).  Claims 12 and 17 each recite the same additional limitation as claim 2, namely "wherein elevating the priority comprises increasing the volume of the media stream receiving the alert."  *Compare* Ex. 1001, 8:40–42 (claim 2)*, with id*. at 9:6–8 (claim 12)*, with id*. at 10:9–11 (claim 17).  Accordingly, Petitioner relies on the same analysis for claims 12 and 17.  *See* Pet. 79 (referring back to its claim 2 analysis).  As discussed above, we find Petitioner's arguments persuasive that Kim teaches such a feature.

Patent Owner does not present any arguments as to claims 12 and 17 beyond those presented for any of the independent claims.  PO Resp. 47–57.

Petitioner has shown by a preponderance of the evidence that claims 12 and 17 would have been obvious over Kim.

### g)  Claims 15 and 20

Claims 15 and 20 depend, respectively, from independent claims 11 and 16.  Ex. 1001, 9:18–20 (claim 15), 10:19–21 (claim 20).  Claims 15 and

27

IPR2023-01294
Patent 8,831,664 B2

20 each recite the same additional limitation as claim 6, namely "wherein elevating the priority includes identifying a primary channel and rendering the alert message to the primary channel." *Compare* Ex. 1001, 8:53–55 (claim 6), *with id.* 9:18–20 (claim 15), *with id.* 10:19–21 (claim 20). Accordingly, Petitioner relies on the same analysis for claims 15 and 20. *See* Pet. 79 (referring back to its claim 6 analysis). As discussed above, we find Petitioner's arguments persuasive that Kim teaches such a feature.

Patent Owner does not present any arguments as to claims 15 and 20 beyond those presented for any of the independent claims. PO Resp. 47–57.

Petitioner has shown by a preponderance of the evidence that claims 15 and 20 would have been obvious over Kim.

### F.  Ground 8 (Kim and Ishibashi)

Petitioner's Ground 8 contends that claims 3–5, 13–14, and 18–19 would have been obvious over Kim and Ishibashi. Pet. 2.

#### 1.  Summary of Ishibashi (Ex. 1009)

Ishibashi is a Japanese patent publication, the title of which has been translated as "Emergency-Alert Broadcast Receiver and Method for Receiving Emergency-Alert Broadcasts." Ex. 1009, code (54). Ishibashi was filed June 3, 2005, and published December 14, 2006. *Id.*, codes (22), (43). Thus, Ishibashi is prior art to the challenged claims under 35 U.S.C. §§102(a) and (b). *See* Ex. 1001, code (63) (identifying December 19, 2008, as the earliest possible effective filing date of the challenged claims).

Ishibashi discloses "an emergency-alert broadcast receiver that automatically switches the audio output to the loudspeaker upon receipt of an emergency-alert broadcast." Ex. 1009 ¶1. Ishibashi explains that the use

28

IPR2023-01294
Patent 8,831,664 B2

of headphones to view videos risks the viewer not receiving or hearing an emergency-alert audio broadcast. *Id*. ¶4. This is so because "once headphones or earphones are plugged into a jack, the loudspeaker is mechanically disconnected so that no sound is output through the loudspeaker" of the video output device. *Id*. Ishibashi's invention, however, "allows the audience to hear the sound of an emergency-alert broadcast upon its receipt, even when the audience has forgotten to unplug their headphones or earphones from the jack after viewing and/or listening to a broadcast, etc., with the headphones or earphones." *Id*. ¶5.

When an "emergency-alert-broadcast activation flag" (*id*. ¶2) is received, Ishibashi teaches "adjust[ing] the audio output to the maximum volume," and routing the audio data "to be output through both the [] loudspeaker and the [] jack," during an emergency-alert broadcast. *Id*. ¶6.

### 2. *Combination of Kim and Ishibashi*

Petitioner argues that both references are from the same field of endeavor as the '664 patent, namely emergency communication systems. Pet. 80 (citing various portions of Exhibits 1001, 1008, and 1009). We are persuaded of this fact, which, in any event, Patent Owner does not dispute. *See* PO Resp. 57 (arguing against Ground 8 solely on the basis of its Ground 7 arguments).

Petitioner argues that a person of ordinary skill in the art would have combined Kim and Ishibashi because the former teaches "that a goal of emergency warning broadcast systems is to ensure that the viewer receives the emergency warning information" and the latter teaches a means to achieving that goal. Pet. 80–81 (citing Ex. 1008, 3:13–19; Ex. 1002 ¶304;

29

IPR2023-01294
Patent 8,831,664 B2

Ex. 1009 ¶¶5, 15, 17).  More specifically, Petitioner argues that a person of ordinary skill in the art "would have been motivated to implement Ishibashi's audio output-switchover circuit in Kim's controller system . . . to ensure that an emergency warning broadcast is received by the viewer even in situations where a headphone jack is left plugged in but unattended (e.g., not being worn) by the viewer."  Pet. 81 (citing Ex. 1002 ¶305).  Petitioner argues that the skilled artisan would have had a reasonable expectation of success in making such a combination and the result would have been predictable.  *Id*. at 82 (citing Ex. 1002 ¶306).  We are persuaded by Petitioner's stated reasons for the combination as well as that there would have been a reasonable expectation of success in making the combination. Further, Patent Owner does not dispute these factual assertions underlying the obviousness analysis.  PO Resp. 57.

We turn now to application of the proposed combination to the challenged claims.

### 3.  Claims 3 and 5

Claim 3 recites:  "The method of claim 1, wherein elevating the priority comprises changing a spatial direction for rendering the media stream receiving the alert."  Ex. 1001, 8:43–45.  Similarly, claim 5 recites: "The method of claim 1, wherein elevating the priority comprises rendering the media stream receiving the alert to a priority spatial direction."  *Id*. at 8:50–52.  Petitioner asserts that these features are satisfied by the proposed combination because the switching of audio from the headphones to the loudspeaker when an emergency alert is received, as taught by Ishibashi,

30

IPR2023-01294
Patent 8,831,664 B2

constitutes a change in the spatial direction to a priority spatial direction.
Pet. 83–85; Ex. 1009 ¶¶5–6.

We are persuaded that Kim in view Ishibashi teaches such features.

Patent Owner does not present any arguments as to claims 3 and 5 beyond those presented for claim 1 in Ground 7.  PO Resp. 57.

Petitioner has shown by a preponderance of the evidence that claims 3 and 5 would have been obvious over Kim and Ishibashi.

### 4.  Claim 4

Claim 4 recites:  "The method of claim 1, wherein elevating the priority comprises increasing the volume of the media stream receiving the alert and changing a spatial direction for rendering the media stream receiving the alert."  Ex. 1001, 8:46–49.

Petitioner asserts that these features are satisfied by the proposed combination because Ishibashi teaches, when an emergency alert is received, both the switching of audio from the headphones to the loudspeaker and increasing the volume to the maximum.  Pet. 85 (citing Ex. 1002 ¶¶313–314); *see also* Pet. 20 (citing Ex. 1009 ¶6).

We are persuaded that Kim in view Ishibashi teaches such a feature.

Patent Owner does not present any arguments as to claim 4 beyond those presented for claim 1 in Ground 7.  PO Resp. 57.

Petitioner has shown by a preponderance of the evidence that claim 4 would have been obvious over Kim and Ishibashi.

### 5.  Claims 13 and 18

Claims 13 and 18 depend, respectively, from independent claims 11 and 16.  Ex. 1001, 9:9–11 (claim 13), 10:12–14 (claim 18).  Claims 13 and

31

IPR2023-01294
Patent 8,831,664 B2

18 each recite the same additional limitation as claim 3, namely "wherein elevating the priority comprises changing a spatial direction for rendering the media stream receiving the alert." *Compare* Ex. 1001, 8:43–45 (claim 3), *with id.* at 9:9–11 (claim 13), *with id.* at 10:12–14 (claim 18). Accordingly, Petitioner relies on the same analysis for claims 13 and 18. *See* Pet. 85–86 (referring back to its claim 3 analysis). As discussed above, we find Petitioner's arguments persuasive that Kim in view of Ishibashi teaches such a feature.

Patent Owner does not present any arguments as to claims 13 and 18 beyond those presented for any of the independent claims in Ground 7. PO Resp. 57.

Petitioner has shown by a preponderance of the evidence that claims 13 and 18 would have been obvious over Kim and Ishibashi.

### 6. *Claims 14 and 19*

Claims 14 and 19 depend, respectively, from independent claims 11 and 16. Ex. 1001, 9:12–16 (claim 14), 10:15–18 (claim 19). Claims 14 and 19 each recite the same additional limitation as claim 4, namely "wherein elevating the priority comprises changing a spatial direction for rendering the media stream receiving the alert." *Compare* Ex. 1001, 8:46–49 (claim 4), *with id.* at 9:12–16 (claim 14), *with id.* at 10:15–18 (claim 19). Accordingly, Petitioner relies on the same analysis for claims 14 and 19. *See* Pet. 85–86 (referring back to its claim 4 analysis). As discussed above, we find Petitioner's arguments persuasive that Kim in view of Ishibashi teaches such a feature.

32

IPR2023-01294
Patent 8,831,664 B2

Patent Owner does not present any arguments as to claims 14 and 19 beyond those presented for any of the independent claims in Ground 7. PO Resp. 57.

Petitioner has shown by a preponderance of the evidence that claims 14 and 19 would have been obvious over Kim and Ishibashi.

### G. Ground 9 (Kim and Goss)

Petitioner's Ground 9 contends that claim 10 would have been obvious over Kim and Goss. Pet. 2.

#### 1. Summary of Goss (Ex. 1010)

Goss is titled "Broadcast Channels for Wireless Telephony." Ex. 1010, code (54). Goss was filed September 17, 1999, and issued February 12, 2008. *Id.*, codes (22), (45). Thus, Goss is prior art to the challenged claims under 35 U.S.C. §§ 102(a) and (e). *See* Ex. 1001, code (63) (identifying December 19, 2008, as the earliest possible effective filing date of the challenged claims).

Goss discloses "broadcast capabilities and messaging services that enable a live or recorded message to be broadcast to a plurality of users," such as "weather broadcasts" and "emergency bulletins." Ex. 1010, 17–9, 1:34–37. Goss further discloses that "[b]roadcast announcement messages may be retransmitted from time to time to alert users who did not receive the message when first transmitted." *Id.* at 6:4–7.

#### 2. Combination of Kim and Goss

Petitioner argues that both references are from the same field of endeavor as the '664 patent, namely emergency communication systems.

33

IPR2023-01294
Patent 8,831,664 B2

Pet. 86 (citing various portions of Exhibits 1001, 1008, and 1010). We are persuaded of this fact, which, in any event, Patent Owner does not dispute. *See* PO Resp. 57–58 (arguing against Ground 9 solely on the basis of its Ground 7 arguments).

Petitioner argues that a person of ordinary skill in the art would have combined Kim and Goss because the former teaches "that a goal of emergency warning broadcast systems is to ensure that the viewer receives the emergency warning information" and the latter teaches a means to achieving that goal. Pet. 87 (citing Ex. 1008, 3:13–19; Ex. 1002 ¶¶326–327; Ex. 1010, 6:4–7, 7:55–57). More specifically, Petitioner argues that a person of ordinary skill in the art "would have been motivated to implement Goss's retransmissions in Kim's emergency warning system to improve the likelihood that an emergency warning broadcast is received by the viewer." Pet. 87–88 (citing Ex. 1002 ¶328). Petitioner argues that the skilled artisan would have had a reasonable expectation of success in making such a combination and the result would have been predictable. *Id*. at 88 (citing Ex. 1002 ¶329). We are persuaded by Petitioner's stated reasons for the combination as well as that there would have been a reasonable expectation of success in making the combination. Further, Patent Owner does not dispute these factual assertions underlying the obviousness analysis. PO Resp. 57.

We turn now to application of the proposed combination to claim 10.

### 3. *Claim 10*

Claim 10 recites: "The method of claim 1, wherein the alert is duplicated and rendered at a higher volume." Ex. 1001, 8:63–64.

34

IPR2023-01294
Patent 8,831,664 B2

Petitioner asserts that these features are satisfied by the proposed combination of Kim and Goss. As for the "duplicated" alert feature, Petitioner directs us to Goss's teaching that "[b]roadcast announcement messages," such as emergency bulletins, "may be retransmitted from time to time to alert users who did not receive the message when first transmitted." Pet. 88 (quoting Ex. 1010, 6:4–7). Petitioner further points out that "Goss accomplishes this by 'repeatedly transmitting an alert message on a periodic basis while said broadcast message is transmitted.'" *Id.* at 88–89 (quoting Ex. 1010, 11:26–29). As for the "higher volume" feature, Petitioner directs us to Kim's teaching of increasing the volume on the television speaker when an emergency-warning broadcast signal is being broadcast. Pet. 89 (referring back to its analysis for claim 2); *see also* Pet. 71 (citing Ex. 1008, 27:16–17, Fig. 3).

We are persuaded that Kim and Goss teach these features.

Patent Owner does not present any arguments as to claim 10 beyond those presented for claim 1 in Ground 7. PO Resp. 57–58.

Petitioner has shown by a preponderance of the evidence that claim 10 would have been obvious over Kim and Goss.

## III.   CONCLUSION

A preponderance of the evidence shows that claims 1–20 are unpatentable. In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–6, 8, 9, 11–20 | 103(a) | Downs, EDACS | | |

35

IPR2023-01294
Patent 8,831,664 B2

| | | | | |
|---|---|---|---|---|
| 1–6, 8, 9, 11–20 | 103(a) | Downs, EDACS, Childress | | |
| 3–5, 13, 14, 18, 19 | 103(a) | Downs, EDACS, Hancock | | |
| 3–5, 13, 14, 18, 19 | 103(a) | Downs, EDACS, Childress, Hancock | | |
| 7, 10 | 103(a) | Downs, EDACS, Reich | | |
| 7, 10 | 103(a) | Downs, EDACS, Childress, Reich | | |
| 1, 2, 6–9, 11, 12, 15–17, 20 | 103(a) | Kim | 1, 2, 6–9, 11, 12, 15–17, 20 | |
| 3–5, 13, 14, 18, 19 | 103(a) | Kim, Ishibashi | 3–5, 13, 14, 18, 19 | |
| 10 | 103(a) | Kim, Goss | 10 | |
| **Overall Outcome** | | | 1–20 | |

IV.    ORDER[10]

In consideration of the foregoing, it is hereby

ORDERED that claims 1–20 of U.S. Patent No. 8,831,664 B2 are
unpatentable;

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims
in a reissue or reexamination proceeding subsequent to the issuance of this
decision, we draw Patent Owner's attention to the April 2019 *Notice
Regarding Options for Amendments by Patent Owner Through Reissue or
Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg.
16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent

36

IPR2023-01294
Patent 8,831,664 B2

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial on the grounds of unpatentability authorized above; the trial commences on the entry date of this decision.

PETITIONER:

Eliot Williams
Michael Knierim
Matthew Thompson
Clarke Stavinoha
eliot.williams@bakerbotts.com
michael.knierim@bakerbotts.com
matthew.thompson@bakerbotts.com
clarke.stavinoha@bakerbotts.com

PATENT OWNER:

Jason Engel
Katherine Allor
Nolan Hubbard
Samuel Richey
Kyle Kantarek
jason.engel.ptab@klgates.com
katy.allor@klgates.com
nolan.hubbard@klgates.com
samuel.richey@klgates.com
kyle.kantarek@kirkland.com

---

Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

37



US008831664B2

(12) **United States Patent**
Shaffer et al.

(10) **Patent No.:**      **US 8,831,664 B2**
(45) **Date of Patent:**      *Sep. 9, 2014**

(54) **SYSTEM AND METHOD FOR PROVIDING CHANNEL CONFIGURATIONS IN A COMMUNICATIONS ENVIRONMENT**

(75) Inventors: **Shmuel Shaffer**, Santa Clara, CA (US); **Steven Christenson**, Santa Clara, CA (US)

(73) Assignee: **Cisco Technology, Inc.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 470 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/210,967**

(22) Filed: **Aug. 16, 2011**

(65) **Prior Publication Data**

US 2011/0299404 A1     Dec. 8, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/340,417, filed on Dec. 19, 2008, now Pat. No. 8,041,378.

(51) **Int. Cl.**
**H04W 4/22** (2009.01)
**H04H 20/59** (2008.01)
*H04W 84/08* (2009.01)

(52) **U.S. Cl.**
CPC ............... **H04H 20/59** (2013.01); *H04W 84/08* (2013.01)
USPC ........... **455/521**; 370/331; 370/465; 370/266; 370/270; 709/204; 709/227; 709/239; 709/224; 709/206; 709/223

(58) **Field of Classification Search**
USPC .................. 455/521; 370/331, 465, 266, 270; 709/204, 227, 239, 224, 206, 223
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,359,603 A   11/1982  Heaton
4,730,306 A   3/1988   Uchida
(Continued)

FOREIGN PATENT DOCUMENTS

CN      101461152      6/2009
EP      0849964        6/1998
(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 12/722,389, entitled "System and Method for Providing Data Channel Management in a Network Environment," filed Mar. 11, 2010; Inventors: Shmuel Shaffer, et al.

(Continued)

*Primary Examiner* — Lam T Mai
(74) *Attorney, Agent, or Firm* — Patent Capital Group

(57)      **ABSTRACT**

A method is provided in one example embodiment and includes monitoring media streams associated with channels in a communication environment. The method also includes receiving an alert in one of the media streams and elevating a priority associated with the media stream receiving the alert. Elevating the priority can include increasing the volume of the media stream receiving the alert, changing a spatial direction for rendering the media stream receiving the alert, rendering the media stream receiving the alert to a priority spatial direction, identifying a primary channel and rendering the alert message to the primary channel, turning a volume down on media streams not receiving the alert, or a combination thereof.

**20 Claims, 5 Drawing Sheets**



Appx00038      Motorola Solutions, Inc., Ex1001, p. 1

**US 8,831,664 B2**

Page 2

(56)                 **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,048,082 | A | 9/1991 | Krafft et al. |
| 5,099,510 | A | 3/1992 | Blinken et al. |
| 5,436,896 | A | 7/1995 | Anderson et al. |
| 5,539,741 | A | 7/1996 | Barraclough et al. |
| 5,539,811 | A | 7/1996 | Nakamura et al. |
| 5,625,407 | A | 4/1997 | Biggs et al. |
| 5,689,245 | A | 11/1997 | Noreen et al. |
| 5,889,769 | A | 3/1999 | Mizuno |
| 6,006,848 | A | 12/1999 | Grube et al. |
| 6,011,841 | A | 1/2000 | Isono |
| 6,011,851 | A | 1/2000 | O'Connor et al. |
| 6,094,578 | A | 7/2000 | Purcell et al. |
| 6,094,579 | A | 7/2000 | Olvera-Hernandez et al. |
| 6,151,309 | A | 11/2000 | Busuioc et al. |
| 6,178,237 | B1 | 1/2001 | Horn |
| 6,185,205 | B1 | 2/2001 | Sharrit et al. |
| 6,233,315 | B1 | 5/2001 | Reformato et al. |
| 6,327,567 | B1 | 12/2001 | Willehadson et al. |
| 6,374,100 | B1 | 4/2002 | Smith et al. |
| 6,385,461 | B1 | 5/2002 | Raith |
| 6,400,816 | B1 | 6/2002 | Hjalmtysson et al. |
| 6,404,873 | B1 | 6/2002 | Beyda et al. |
| 6,408,327 | B1 | 6/2002 | McClennon et al. |
| 6,418,214 | B1 | 7/2002 | Smythe et al. |
| 6,421,002 | B2 | 7/2002 | Krasner |
| 6,453,022 | B1 | 9/2002 | Weinman, Jr. |
| 6,501,739 | B1 | 12/2002 | Cohen |
| 6,501,740 | B1 | 12/2002 | Sun et al. |
| 6,608,820 | B1 | 8/2003 | Bradshaw, Jr. |
| 6,708,030 | B1 | 3/2004 | Horikawa |
| 6,721,284 | B1 * | 4/2004 | Mottishaw et al. ........... 370/255 |
| 6,792,092 | B1 | 9/2004 | Michalewicz |
| 6,813,250 | B1 | 11/2004 | Fine et al. |
| 6,850,496 | B1 | 2/2005 | Knappe et al. |
| 6,873,854 | B2 | 3/2005 | Crockett et al. |
| 6,882,856 | B1 | 4/2005 | Alterman et al. |
| 6,885,874 | B2 | 4/2005 | Grube et al. |
| 6,912,389 | B2 | 6/2005 | Bright et al. |
| 6,944,137 | B1 | 9/2005 | Pan et al. |
| 6,965,767 | B2 | 11/2005 | Maggenti et al. |
| 6,982,961 | B2 | 1/2006 | Refai et al. |
| 6,987,480 | B1 | 1/2006 | Kotick et al. |
| 6,987,841 | B1 | 1/2006 | Byers et al. |
| 6,993,120 | B2 | 1/2006 | Brown et al. |
| 6,996,088 | B1 | 2/2006 | Kroon et al. |
| 6,996,406 | B2 | 2/2006 | Lection et al. |
| 6,999,782 | B2 | 2/2006 | Shaughnessy et al. |
| 6,999,783 | B2 | 2/2006 | Toyryla et al. |
| 7,003,286 | B2 | 2/2006 | Brown et al. |
| 7,006,607 | B2 | 2/2006 | Garcia |
| 7,010,106 | B2 | 3/2006 | Gritzer et al. |
| 7,010,109 | B2 | 3/2006 | Gritzer et al. |
| 7,010,275 | B2 | 3/2006 | Davies |
| 7,013,279 | B1 | 3/2006 | Nelson |
| 7,031,700 | B1 | 4/2006 | Weaver et al. |
| 7,034,678 | B2 | 4/2006 | Burkley et al. |
| 7,035,385 | B2 | 4/2006 | Levine et al. |
| 7,058,168 | B1 | 6/2006 | Knappe et al. |
| 7,062,286 | B2 | 6/2006 | Grivas et al. |
| 7,072,952 | B2 | 7/2006 | Takehiro et al. |
| 7,079,857 | B2 | 7/2006 | Maggenti et al. |
| 7,091,851 | B2 | 8/2006 | Mason et al. |
| 7,149,477 | B2 | 12/2006 | Ogami |
| 7,237,117 | B2 | 6/2007 | Weiss |
| 7,271,742 | B2 | 9/2007 | Sheha et al. |
| 7,292,544 | B2 | 11/2007 | Roher et al. |
| 7,328,036 | B2 | 2/2008 | Hart et al. |
| 7,339,900 | B2 | 3/2008 | Perlman |
| 7,352,707 | B2 | 4/2008 | Ho et al. |
| 7,369,513 | B1 | 5/2008 | Sankaran |
| 7,369,530 | B2 | 5/2008 | Keagy |
| 7,379,961 | B2 | 5/2008 | Matsuoka |
| 7,418,090 | B2 | 8/2008 | Reding et al. |
| 7,426,192 | B2 | 9/2008 | Amano et al. |
| 7,460,492 | B2 | 12/2008 | Portolani et al. |
| 7,463,597 | B1 | 12/2008 | Kompella |
| 7,466,812 | B1 | 12/2008 | Mahy et al. |
| 7,508,840 | B2 | 3/2009 | Delaney |
| 7,526,306 | B2 | 4/2009 | Brems et al. |
| 7,558,221 | B2 | 7/2009 | Nelson et al. |
| 7,606,256 | B2 | 10/2009 | Vitebsky et al. |
| 7,633,914 | B2 | 12/2009 | Shaffer et al. |
| 7,636,339 | B2 | 12/2009 | Shaffer et al. |
| 7,639,634 | B2 | 12/2009 | Shaffer et al. |
| 7,706,339 | B2 | 4/2010 | Shaffer et al. |
| 7,710,983 | B2 * | 5/2010 | Zheng et al. .................. 370/396 |
| 7,821,978 | B2 | 10/2010 | Staack |
| 7,831,270 | B2 | 11/2010 | Kalley et al. |
| 7,860,070 | B2 | 12/2010 | Shaffer et al. |
| 7,860,958 | B2 | 12/2010 | Yoon et al. |
| 7,869,386 | B2 | 1/2011 | Shaffer et al. |
| 7,933,286 | B2 | 4/2011 | Vitebsky et al. |
| 7,953,859 | B1 * | 5/2011 | Kiefhaber et al. ........... 709/227 |
| 8,041,378 | B2 * | 10/2011 | Shaffer et al. ................ 455/521 |
| 8,619,586 | B2 * | 12/2013 | Hanes et al. .................. 370/241 |
| 2002/0152305 | A1 | 10/2002 | Jackson et al. |
| 2003/0055711 | A1 | 3/2003 | Doherty |
| 2004/0139320 | A1 | 7/2004 | Shinohara |
| 2004/0249949 | A1 | 12/2004 | Gourraud et al. |
| 2005/0015444 | A1 | 1/2005 | Rambo |
| 2005/0171954 | A1 | 8/2005 | Hull et al. |
| 2005/0232207 | A1 | 10/2005 | Antoniadis et al. |
| 2006/0114847 | A1 | 6/2006 | Dssouli et al. |
| 2006/0118636 | A1 | 6/2006 | Miles et al. |
| 2006/0165060 | A1 | 7/2006 | Dua |
| 2006/0281471 | A1 | 12/2006 | Shaffer et al. |
| 2007/0030144 | A1 | 2/2007 | Titus et al. |
| 2007/0060144 | A1 | 3/2007 | Mills et al. |
| 2007/0104121 | A1 | 5/2007 | Shaffer et al. |
| 2007/0115848 | A1 | 5/2007 | Chean et al. |
| 2007/0202907 | A1 | 8/2007 | Shaffer et al. |
| 2007/0202908 | A1 | 8/2007 | Shaffer et al. |
| 2007/0203996 | A1 | 8/2007 | Davitz et al. |
| 2007/0239824 | A1 | 10/2007 | Shaffer et al. |
| 2007/0266097 | A1 | 11/2007 | Harik et al. |
| 2007/0271336 | A1 | 11/2007 | Ramaswamy |
| 2007/0280203 | A1 | 12/2007 | Shaffer et al. |
| 2007/0282621 | A1 | 12/2007 | Altman et al. |
| 2007/0293240 | A1 | 12/2007 | Drennan |
| 2008/0005249 | A1 | 1/2008 | Hart |
| 2008/0037461 | A1 | 2/2008 | Biltz et al. |
| 2008/0045236 | A1 | 2/2008 | Nahon et al. |
| 2008/0159128 | A1 | 7/2008 | Shaffer et al. |
| 2008/0167049 | A1 | 7/2008 | Karr et al. |
| 2008/0280637 | A1 | 11/2008 | Shaffer et al. |
| 2009/0144377 | A1 | 6/2009 | Kim et al. |
| 2010/0159975 | A1 | 6/2010 | Shaffer |
| 2010/0159977 | A1 | 6/2010 | Shaffer |
| 2010/0161727 | A1 | 6/2010 | Shaffer |
| 2011/0239252 | A1 | 9/2011 | Kazama et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1622044 | 2/2006 |
| EP | 1920026 | 8/2006 |
| EP | 1889495 | 12/2006 |
| EP | 1920615 | 2/2007 |
| EP | 2030338 | 12/2007 |
| FR | 2674355 A | 9/1992 |
| WO | WO0191485 | 11/2001 |
| WO | WO02/074051 | 9/2002 |
| WO | WO2006/135533 | 12/2006 |
| WO | WO2007/021586 | 2/2007 |
| WO | WO2007/027356 | 3/2007 |
| WO | WO2007/142961 | 12/2007 |

OTHER PUBLICATIONS

PCT Feb. 10, 2001 International Search Report from PCT/EP01/04570; 1 page.

PCT Feb. 27, 2007 Notification of Transmittal of the International Search Report for PCT/US06/30447; 2 pages.

PCT Apr. 9, 2007 Notification of Transmittal of the International Search Report from PCT/US06/30294; 1 page.

US 8,831,664 B2

Page 3

(56) **References Cited**

OTHER PUBLICATIONS

PCT Sep. 4, 2007 International Search Report from PCT/US02/08419; 2 pages.

PCT Sep. 4, 2007 International Search Report and Written Opinion from PCT/US06/19227; 7 pages.

PCT Dec. 11, 2007 International Preliminary Report on Patentability ( 1 page) and the Written Opinion of the International Searching Authority (3 pages), for PCT/US06/19227.

PCT Feb. 12, 2008 International Preliminary Report on Patentability ( 1 page) and the Written Opinion of the International Searching Authority (14 pages), from PCT/US06/30447.

PCT Mar. 14, 2008 International Preliminary Report on Patentability (1 page) and the Written Opinion of the International Searching Authority or the Declaration (4 pages) for PCT/US06/30294.

PCT Sep. 17, 2008 Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority for PCT/US07/12728; 6 pages.

PCT Dec. 3, 2008 International Preliminary Report on Patentability (1 page) and the Written Opinion of the International Searching Authority (5 pages) from PCT/US07/12728.

USPTO Jun. 27, 2011 Notice of Allowance from U.S. Appl. No. 12/340,417.

USPTO Jul. 11, 2011 Nonfinal Office Action from U.S. Appl. No. 12/340,451.

USPTO Jan. 17, 2012 Response to Oct. 14, 2011 Nonfinal Office Action from U.S. Appl. No. 12/340,468.

USPTO Sep. 20, 2012 Non-Final Office Action from U.S. Appl. No. 12/722,389.

USPTO Oct. 4, 2013 Non-Final Rejection from U.S. Appl. No. 12/340,468.

USPTO Apr. 5, 2013 Notice of Allowance from U.S. Appl. No. 12/722,389.

Herther, Jay, et al., "Voice-Over-interintranet Protocol for Critical Communications," Urgent Communications, The Official Publication of IWCE, Aug. 2001, 3 pages http://urgentcomm.com/mag/radio_voiceoverintranet_protocol_critical/.

Interoperability Gateway, OpenSky, NetworkFirst, P25$^{IP}$, Data Sheet, M/A-COM, Inc. ECR-7054, [Printed on Jun. 28, 2011] http://www.pspc.harris.com/media/ECR-7054E_tcm27-10470.pdf.

McKay, Jim, "Intact Amid Chaos," Government Technology, Mar. 2005, 3 pages http://www.bultronic.net/documents/articles/intact%20amid%20chaos.pdf.

Urgent Communications: Service, Safety, Security, "5 for '05 Technologies," Dec. 1, 2004; 6 pages; http://urgentcomm.com/mag/publicsafety/radio_technologies/.

Urgent Communications: Service, Safety, Security, "M/A-Com Emphasizes Power of IP in Seven Announcents at APCO," Aug. 18, 2002, 5 pages http://urgentcomm.com/products/new/radio_macom_emphasizes_power/index.html.

NetworkFirst Interoperability Solved, Data Sheet, M/A-COM, Inc., ECR-7018A, [Printed on Jun. 28, 2011] 6 pages; http://www.ka-omminc.com/PDF/NetworkFirstRevised5_03.pdf.

Polk, J., et al., "Dynamic Host Configuration Protocol Option for Coordinate-based Location Configuration Information," Network Working Group, Internet RFC 3825, Jul. 2004, 15 pages.

Rivero-Angeles, Mario et al., "Random-Access Control Mechanism Using Adaptive Traffic Load in ALOHA and CSMA Strategies for EDGE," IEEE Transactions on Vehicular Technology, vol. 54, No. 3, May 2005; Abstract Only http://ieeexplore.ieee.org/xpl/freeabs_all.jsp?arnumber=1433259.

Trimeche, M., "Digital Rights Management for Visual Content in Mobile Applications," published Sep. 27, 2004; ISBN )-7803-8379-6; © 2004 IEEE; http://ieeexplore.ieee.org; pp. 95-98.

V$^{IP}$ Dispatch Console, OpenSky, NetworkFirst, P25$^{IP}$, Data Sheet, M/A-COM, Inc. ECR-7241C, © 2006 M/A-COM, Inc., 2 pages http://www.bultronic.net/documents/NetworkFirst/VIP%20Dispatch%20Console.pdf.

USPTO Nov. 9, 2011 Notice of Allowance from U.S. Appl. No. 12/340,451.

USPTO Dec. 18, 2012 Response to Sep. 20, 2012 Non-Final Office Action from U.S. Appl. No. 12/722,389.

USPTO Mar. 9, 2012 Final Rejection from U.S. Appl. No. 12/340,468.

USPTO May 24, 2012 RCE Response to Mar. 9, 2012 Final Rejection from U.S. Appl. No. 12/340,468.

USPTO Oct. 11, 2011 Response to Nonfinal Office Action mailed Jul. 11, 2011 from U.S. Appl. No. 12/340,451.

USPTO Oct. 14, 2011 Nonfinal Office Action from U.S. Appl. No. 12/340,468.

Wikipedia, "Minimum spanning tree," http://en.wikipedia.org/wiki/Minimum_spanning_tree, Dec. 18, 2008, 5 pages.

Wikipedia, "Distributed minimum spanning tree," http://en.wikipedia.org/wiki/Distributed_minimum_spanning_tree, Dec. 18, 2008, 2 pages.

Bender, Ron, et al., "Multiple Choices for Critical Communications," Urgent Communications, The Official Publication of IWCE, Oct. 2001, 4 pages; http://urgentcomm.com/mag/radio_multiple_choices_critical_2/.

C3 Maestro$^{IP}$ Dispatch Console, OpenSKY, NetworkFirst, P25$^{IP}$, Data Sheet, M/A-COM, Inc. ECR-7160A, [Printed on Jun. 28, 2011] 2 pages http://www.pspc.harris.com/media/ECR-7160E_tcm27-10458.pdf.

Cisco IPICS, Solution Overview, "Collaborative Incident Response," © Cisco Systems, Inc. 2010, 2 pages, www.cisco.com/go/ipics.

Wikipedia, "Plectron," http://en.wikipedia.org/wiki/Plectron, Dec. 18, 2008, 2 pages.

Thunder Eagle, Inc.—Radio Wireless Alerting Systems, "MRI-100™: Multi Radio Interface," http://www.thuneagle.com/mri100.htm, Dec. 18, 2008, 2 pages.

Positron Public Safety Systems, "Product Specifications: Power RADIO," http://www.positron911.com/products/powerRADIO/powerRADIO_specs.asp, Dec. 18, 2008, 2 pages.

* cited by examiner



FIG. 1



FIG. 2A

FIG. 2B

Appx00042    Motorola Solutions, Inc., Ex1001, p. 5



FIG. 3



FIG. 4



FIG. 5

Appx00045      Motorola Solutions, Inc., Ex1001, p. 8

US 8,831,664 B2

**1**

## SYSTEM AND METHOD FOR PROVIDING CHANNEL CONFIGURATIONS IN A COMMUNICATIONS ENVIRONMENT

### RELATED APPLICATION

This Application is a continuation (and claims the benefit of priority under 35 U.S.C. §120) of U.S. application Ser. No. 12/340,417, filed Dec. 19, 2008, entitled "SYSTEM AND METHOD FOR PROVIDING CHANNEL CONFIGURA-TIONS IN A COMMUNICATIONS ENVIRONMENT," Inventor(s) Shmuel Shaffer, et al. The disclosure of the prior application is considered part of (and is incorporated by reference in) the disclosure of this application.

### TECHNICAL FIELD OF THE INVENTION

This invention relates in general to the field of communications and, more particularly, to a system and a method for providing channel configurations in a communications environment.

### BACKGROUND OF THE INVENTION

Communications architectures have grown increasingly complex in communication environments. This complexity has resulted in numerous protocols being implemented to satisfy endpoints and to intelligently respond to challenging situations. Push-to-talk (PTT) devices are commonly used in safety and security environments. PTT devices carried by emergency response personnel (ERT) can support a single channel or a plurality of channels.

Typically, a management center supports a plurality of channels, where less important channels are rendered to one ear, and channels that are more important are rendered to the other ear. Universally, channels are statically configured, where the volume of each channel can be manually adjusted by an end user. When important information needs to be broadcast, channels should be configured optimally. If the channels are not fully utilized, then messages are not received by their intended recipients.

Thus, the ability to offer a system or a protocol that offers an effective coordination for channels in a communications environment provides a significant challenge to network designers, component manufacturers, service providers, and system administrators alike.

### BRIEF DESCRIPTION OF THE DRAWINGS

To provide a more complete understanding of the present invention and features and advantages thereof, reference is made to the following description, taken in conjunction with the accompanying figures, wherein like reference numerals represent like parts, in which:

FIG. **1** is a simplified block diagram of a communication system for providing channel configurations in a communications environment in accordance with one embodiment of the present invention;

FIG. **2A** is a simplified schematic diagram of a management center that may be part of the communication system in accordance with one embodiment of the present invention;

FIG. **2B** is a simplified schematic diagram of an aspect of the management center in accordance with one embodiment of the present invention;

FIG. **3** is a simplified schematic diagram of an element that may be part of the management center in accordance with one embodiment of the present invention;

**2**

FIG. **4** is a simplified schematic diagram illustrating another example implementation of the management center; and

FIG. **5** is a simplified flowchart illustrating a scenario implicating the communication system.

### DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

Overview

A method is provided in one example embodiment and includes monitoring a plurality of channels provisioned for an endpoint. The method also includes reacting to an alert message by adjusting one of the channels for the endpoint. The adjustment is a selected one of increasing a volume associated with the channel receiving the alert message, or changing a spatial direction from which the alert message and an associated media stream are conveyed to the endpoint. In other embodiments, the adjustment provisions the alert message from a left ear to a right ear of an end user of the endpoint. In still other embodiments, the adjustment includes determining which is a primary channel of the channels and provisioning the alert message to the primary channel of the endpoint. The media stream associated with the alert message is also moved to a same spatial direction along with the alert message.

In still other embodiments, the adjustment includes turning a volume down on every other channel besides a channel being used for the alert message. In yet other embodiments, the adjustment includes using out-of-band signaling. In other embodiments, the method includes sending the alert message until feedback has been received, which indicates that the alert message has been acknowledged by the endpoint.

FIG. **1** is a simplified block diagram for coordinating communications received by one or more endpoints. Communication system **10** includes a server **14**, which could include a server administration console, an operational view, and a policy engine: all of which are depicted as element **18**. FIG. **1** also includes an IP network **20**, which is coupled to a router media service (RMS) element **30** and a universal media service (UMS) element **34**. UMS **34** is coupled to a public switched telephone network (PSTN) and can effectively coordinate sessions for a multitude of end-user devices, as is shown. RMS **30** is coupled to a management center **38** and a phone client **36**. RMS **30** is also coupled to a series of end-user devices for which it may facilitate coordinating audio and/or data exchanges in the network.

Note that the end-user devices of FIG. **1**, as generally depicted at **40** and **50**, are providing just some of the many examples that could be used in conjunction with the present invention. In a general sense, elements **40** and **50** are examples of field equipment, while element **24** is an example for end-user equipment, which resides in the control center. These devices (referred to as 'endpoint' as used herein in this document) may include VHF radios, UHF radios, PSTN telephones, IP phones, push-to-talk telephones, cellular telephones, laptops, desktop computers, personal digital assistants (PDAs), or any other suitable end-user device capable of exchanging audio or other data in the architecture. Before turning to the operational aspects of the present invention, FIG. **2A** is briefly introduced. FIG. **2A** is a simplified schematic diagram of a display **60**, which can be part of management center **38**. FIG. **2A** includes one or more groups for which a particular end-user is subscribed. The groups include a DevTest **70**, a SysTestTeam **72**, a server team **74**, a management group **76**, an EFT team **78**, and a dispatcher **79**. Also provided are several pages on the left-hand side of the diagram, which help illustrate some of the end-users and some of

US 8,831,664 B2

3

the groups for this particular end-user. A tab **80** is also provided and can be used to expand the pages from the left-hand side of the user's screen. FIG. **2A** also includes a volume control **62** and each of the channels can have its own volume adjustment.

For purposes of illustrating the techniques of communication system **10**, it is important to understand the typical communications that may be traversing the network. The following foundational information may be viewed as a basis from which the present invention may be properly explained. Such information is offered earnestly for purposes of explanation only and, accordingly, should not be construed in any way to limit the broad scope of the present invention and its potential applications.

PTT devices, such as those shown in FIG. **1** [generally at **40** and **50**], are commonly used in safety and security environments. PTT devices such as those [carried by emergency response personnel (ERT)] can support either a single channel or a plurality of channels. Management center **38** is an example of a PTT device, which supports a plurality of channels. Management center **38** can support a plurality of channels, where important channels are rendered to one ear (e.g., the right) and the less important channels are sent to the other ear (e.g., the left). It should be noted that some systems may provide users with the ability to position media streams at a variety of spatial arrival directions. The fact that we describe our system by way of example with respect to left and right ear should not be viewed as limiting it only to these two arrival directions.

A problem occurs when a user turns down the volume of a given channel and, as a result, cannot hear an alert tone or the conversation that follows on that channel. This may result in a user not responding to an important alert signal sent by another user, or by the system. Consider an example involving a police officer, who is on a UHF radio. Management center **38** can listen in on a multitude of channels. For the police officer in this example, audio channels can be configured on his device such that certain types of audio data will be directed to either the left ear or the right ear. For example, one typical application could involve configuring a management center **38** to render to the right ear of the dispatcher communication over a UHF radio channel and turning the volume up on that channel. The left ear could be configured to receive passive communications that may not be critical to the police officer's routine activities (e.g., a VHF channel).

Following along with this example of the police officer, an urgent message is broadcast over this VHF radio. The channel could be called "North District" or "City Works" in this example. In this example, an officer has been shot or has been inured such that he requires assistance. In this instance, the alert came on the VHF non-high priority channel. This alert message may or may not have been heard by other officers, or, because the volume on that specific channel may have been turned down, the officer may not hear the following communication on the low priority VHF channel.

In accordance with the techniques and teachings of the present invention, communication system **10** can readily identify this alert message and respond in any number of ways to ensure that the message was properly received. One intelligent response mechanism of the present invention provisions communications from the left ear to the right ear or vice versa. Another intelligent response mechanism simply turn up the volume on a channel that the alert. Note that these responses could easily be combined into an automatic reconfiguration.

Another intelligent response for this scenario is for management center **38** to identify which channel is the primary

4

channel for one or more end-users. Due to the urgency of this event alert, the system responds by moving the alert message to the primary channel and marginalizing all the other channels for a configurable period. Part of this response also includes turning the volume down on every other channel. Thus, management center **38** can promptly identify an event alert and coordinate a suitable response autonomously, or in conjunction with a server that would assist in provisioning the appropriate channels.

In other embodiments, a resource management server (capable of processing media services) can coordinate an effective response that includes either an audio tone or a message being sent out-of-band. This server could be UMS **34** or RMS **30**. For the out-of-band signaling, the identification of the alert is provided in the header of a packet, in the payload of the packet, in control packets, or in any other suitable location. Furthermore, this out-of-band signaling is sent to management center **38**, which can assist in processing this data. Management center **38** promptly identifies the information included in these packets. In the case of out-of-band signaling, if an end user has stepped out (for whatever reason), because the specific channel has been moved, the actions taken by the system in response to the alert could signify to him what has occurred while he was away.

As can be appreciated by the foregoing description and the discussions herein, the coordination of the responses for these alert messages can occur at the edge of the network, at a server, or performed as a hybrid of these functions. The server is predominantly part of the network in the context of some of these discussions. Thus, an alert event can be captured and subsequent responses properly coordinated by management center **38**, server **14**, RMS **30**, or UMS **34**. All of these elements can have the intelligence to dictate an effective response mechanism, as prescribed herein.

Before turning to some of the operations of this architecture, a brief discussion is provided about some of the infrastructure of FIG. **1**. Software (which manages the operations of the system in accordance with some embodiments of the invention) can reside in the network. By "reside in the network" such terminology is meant connote that the software can be hosted on any suitable device or component, for example, included in management center **38**, server **14**, RMS **30**, and UMS **34**. These elements may include any suitable combination of software or hardware to execute the response mechanisms and/or perform the coordination of channels as outlined herein. All of these elements may be referred to as 'management elements' as used herein in this Specification, which could be routers, switches, gateways, bridges, loadbalancers, firewalls, servers, or any other suitable device, component, element, or object operable to assist in these activities. Moreover, these management elements may include any suitable hardware, software, components, modules, interfaces, or objects that facilitate the operations thereof. This may be inclusive of appropriate algorithms and communication protocols that allow for the effective exchange of data or information in the architecture.

Each of these management elements can also include memory elements for storing information to be used in achieving the channel management and coordination operations as outlined herein. Additionally, each of these devices may include a processor that can execute software or an algorithm to perform the management activities as discussed in this specification. Memory elements and processors (which facilitate these outlined operations) may be included in these management elements or provided externally to these elements, or consolidated in any suitable fashion. The processors can readily execute code (software) for effectuating

US 8,831,664 B2

5

the activities described. These devices may further keep information in any suitable random access memory (RAM), read only memory (ROM), erasable programmable ROM (EPROM), electronically erasable PROM (EEPROM), application specific integrated circuit (ASIC), software, hardware, or in any other suitable component, device, element, or object where appropriate and based on particular needs.

Note also that the specific coordination and response mechanisms may be provided external to any of the management elements, as opposed to provided internally. In addition, some, all, or none of these operations may be suitably combined across these elements, or provided in just one element to accomplish the operations as outlined herein in this document.

Turning to a particular component that may be entrusted with some of these response obligations, the UMS is the component that receives the audio streams in the architecture in certain embodiments of the present invention. It is not necessarily the only component that receives this audio information. The UMS can also receive out-of-band messages, and it too can have information regarding who is registered and who is listening to messages in the architecture. The UMS can simply re-stream media that it receives in certain embodiments. Because the UMS has information regarding who is listening on giving channels, it too can take the initiative in provisioning channels for endpoint devices. It has the intelligence to understand which streams should be given priority over other streams. Thus, the UMS can shift the streams or it can elect which streams and at which volume should propagate to end user devices.

In typical scenarios, users may be listening to multiple channels simultaneously. For a user to be able to listen to multiple channels, the media streams of the channels need to be mixed in a two dimensional mixer. A two dimensional mixer is a mixer that facilitates assigning of media streams to left and/or right ear. This mixer can also control the relative volume of each media stream played to the right and left ear. In accordance one example implementation, multiple media streams arrive at management center **38** and the mixing of these media streams takes place in management center **38**.

In accordance with another example aspect of the present architecture, multiple media streams arrive at UMS **34** or RMS **30** and are being mixed there. The resulting two media streams (per user] are then streamed from the RMS/UMS to management center **38**. Such an architecture has the advantage that the bandwidth it needs [between management center **38** and IP network **20**] is enough to accommodate two media streams. In a hybrid architecture, some mixing takes place on the UMS/RMS and some at management center **38** is also covered by our invention. In this sense, the provisioning is being done externally, and the individual endpoints do not have to be capable of managing these alert messages.

Note that in previous embodiments, management center **38** would perform a certain amount of mixing functions for the endpoints. For example, ten different media streams could be propagating down to management center **38**, which is relegated to task of managing the streams from multiple endpoints. Management center **38** is assigning each of those streams to either the left ear or the right ear or both. By properly managing the volume of the mixed channels, any channel can be configured to appear for the user from any designated arrival direction. Furthermore, each channel is receiving the stream at a prescribed volume.

This mixing functionality (which could be provided in software or in hardware) could effectively be moved to the UMS such that these activities are performed by one or more alternative components, and not necessarily performed by

6

management center **38**. In this sense, this functionality has been moved into the network (potentially residing on a server that includes a processor and a memory element for storing code to be executed by the processor) and this embodiment is certainly within the broad scope of the present invention.

In other scenarios, management center **38** is monitoring all of the received media streams, where it can detect that media should be rendered to an active channel whose volume was set below a given threshold, and then assumes that the alert may have to be duplicated or a volume adjustment should be made. One reaction to this scenario would be to increase the volume of the channel where the tone is played and relatively decrease the volume of chatter on other channels. Please note that teachings of the present invention do not solely accommodate alert tones. Such an architecture can also handle events, where the priority of a given channel is elevated by the dispatcher, or when a dispatcher adds a high priority virtual talk group (VTG) to the channel. Note that the priority of the channel is elevated not only for the alert tone, but also for the following media stream. This is done by increasing the volume of the said channel and by moving it to the priority direction, e.g., right ear.

In still other scenarios, the present architecture can continuously signal the alert until feedback has been received that indicates that the alert has been acknowledged. In other embodiments, the alert could be continuously increased in volume and/or duration until properly acknowledged by an endpoint (either vocally, through software, through out-of-band signaling, etc.).

Turning now to some of the potential infrastructure of example embodiments of the present architecture, FIG. **2B** is a simplified schematic diagram of the dispatcher channel controls and includes volume control **62**. Various components of the architecture can control volume parameters on individual channels. Thus, channel controls can be independent of one another. Note also that management center **38** can be implemented in either software or hardware. Some of the FIGURES show management center **38** being implemented in software and, therefore, the buttons in FIGS. **2A** and **2B** are soft buttons. The present invention covers implementations of the system in hardware, software or any hybrid implementation of these elements.

FIG. **3** is a simplified schematic diagram of a settings element within the management center. The settings include a status **82**, a series of groups **90**, and a spatial position **92**. The groups **90** are depicted having certain positions, which may signify their respective priorities. The configuration of a specific position for any given communication group controls the location of this specific channel on the management center screen, as shown in FIG. **2A**. In this example, the management team is relegated to position number five, whereas the DevTest group, which was configured to position **01** has the highest priority and, therefore, is positioned at the top left of the management center screen. These groups may be configured by an end-user, a manager, or by an administrator of the system based on particular needs. Spatial position **92** includes a drop-down menu in which the user may select stereo, left, right, or another configuration for channels to be heard by an end-user. Also provided in FIG. **3** is a skin tab, which can be selected in order to change the appearance of management center **38**.

FIG. **4** is a simplified schematic diagram of an example management center **96**. In this example case, the layout has changed and a number of important groups are highlighted for this particular end-user, who will receive alert messages intended for the groups for which he is subscribed (or con-

Appx00048   Motorola Solutions, Inc., Ex1001, p. 11

US 8,831,664 B2

7

figured). It is important to note that any suitable configuration or selection of end user groups may be accommodated by the present invention

Note that with the example provided above, as well as numerous other examples provided herein, interaction may be described in terms of two, three, or four network elements. However, this has been done for purposes of clarity and example only. In certain cases, it may be easier to describe one or more of the functionalities of a given set of flows by only referencing a limited number of network elements. It should be appreciated that communication system **10** (and its teachings) are readily scalable and can accommodate a large number of components, as well as more complicated/sophisticated arrangements and configurations. Accordingly, the examples provided should not limit the scope or inhibit the broad teachings of communication system **10** as potentially applied to a myriad of other architectures.

It is also important to note that the steps in the preceding flows illustrate only some of the possible scenarios that may be executed by, or within, communication system **10**. Some of these steps may be deleted or removed where appropriate, or these steps may be modified or changed considerably without departing from the scope of the present invention. In addition, a number of these operations have been described as being executed concurrently with, or in parallel to, one or more additional operations. However, the timing of these operations may be altered considerably. The preceding operational flows have been offered for purposes of example and discussion. Substantial flexibility is provided by communication system **10** in that any suitable arrangements, chronologies, configurations, and timing mechanisms may be provided without departing from the teachings of the present invention.

Although the present invention has been described in detail with reference to particular arrangements and configurations, these example configurations and arrangements may be changed significantly without departing from the scope of the present invention. For example, although the present invention has been described with reference to particular communication exchanges involving channels, communication system **10** can also manage alerts and events on other pathways. Note also that the term 'alert message' as used herein in this Specification is meant to connote any type of message or signal that was intended for one or more end users. The message may inform the end users or apprise them of some situation, or alternatively simply convey some information from a sender. This may include simple conversational exchanges and/or simple correspondence between two end users operating their endpoints.

The present architecture can also resolve any possible conflict between one or more alerts. This may involve a simple priority designation such that one alert is sounded or sent over (or in place of) another, or it may involve delay mechanisms, where one alert is sent along at a later time. Additionally, although described with reference to emergency, police, and fire fighter type applications, the present invention can certainly be used in operational environments where there are communication flows propagating amongst users within a given group. These communication environments could involve non-emergency scenarios.

FIG. **5** is a simplified flowchart illustrating an example scenario involving communication system **10**. The flow begins at step **100**, where a channel of an end-user device is set at a low priority and at a low volume. In this example, the end user is part of some group for which alert messages are sent. The name of this group is Eastern District Fire for this hypothetical. At step **102**, the system checks to identify if an alert indication has been received.

8

If the answer to this query is NO, then the process circles back to the decision block of the flow. If, however, the answer to this query is YES, then the process moves to step **104**, where the volume of the channel is increased and/or, the system moves the channel to the high priority spatial position.

At step **106**, the volume of other channels is reduced in this example. Note also that the system is designed to check to see if multiple alerts were received at the same time. When this occurs, the system may delay one of the alert tones (but not the other actions, e.g., volume increase and move to high priority spatial position) to ensure that the user is made aware that multiple alerts for multiple events were sent. Any suitable combination of these response reactions are certainly within the broad scope of the present invention.

Numerous other changes, substitutions, variations, alterations, and modifications may be ascertained to one skilled in the art and it is intended that the present invention encompass all such changes, substitutions, variations, alterations, and modifications as falling within the scope of the appended claims. In order to assist the United States Patent and Trademark Office (USPTO) and, additionally, any readers of any patent issued on this application in interpreting the claims appended hereto, Applicant wishes to note that the Applicant: (a) does not intend any of the appended claims to invoke paragraph six (6) of 35 U.S.C. section 112 as it exists on the date of the filing hereof unless the words "means for" or "step for" are specifically used in the particular claims; and (b) does not intend, by any statement in the specification, to limit this invention in any way that is not otherwise reflected in the appended claims.

What is claimed is:

**1**. A method, comprising:

monitoring media streams associated with channels in a communication environment;

receiving an alert in one of the media streams; and

elevating a priority associated with the media stream receiving the alert, such that an adjustment is made to how the media stream is provisioned to an endpoint in the communication environment.

**2**. The method of claim **1**, wherein elevating the priority comprises increasing the volume of the media stream receiving the alert.

**3**. The method of claim **1**, wherein elevating the priority comprises changing a spatial direction for rendering the media stream receiving the alert.

**4**. The method of claim **1**, wherein elevating the priority comprises increasing the volume of the media stream receiving the alert and changing a spatial direction for rendering the media stream receiving the alert.

**5**. The method of claim **1**, wherein elevating the priority comprises rendering the media stream receiving the alert to a priority spatial direction.

**6**. The method of claim **1**, wherein elevating the priority includes identifying a primary channel and rendering the alert message to the primary channel.

**7**. The method of claim **1**, wherein elevating the priority includes turning a volume down on media streams not receiving the alert.

**8**. The method of claim **1**, wherein the alert is received in a header of a packet of the media stream.

**9**. The method of claim **1**, wherein the alert is received in a control packet of the media stream.

**10**. The method of claim **1**, wherein the alert is duplicated and rendered at a higher volume.

**11**. Non-transitory readable media that includes code for execution and when executed by a processor operable to perform operations comprising:

US 8,831,664 B2

9

monitoring media streams associated with channels in a communication environment;

receiving an alert in one of the media streams; and

elevating a priority associated with the media stream receiving the alert.

12. The non-transitory readable media of claim 11, wherein elevating the priority comprises increasing the volume of the media stream receiving the alert.

13. The non-transitory readable media of claim 11, wherein elevating the priority comprises changing a spatial direction for rendering the media stream receiving the alert.

14. The non-transitory readable media of claim 11, wherein elevating the priority comprises increasing the volume of the media stream receiving the alert and changing a spatial direction for rendering the media stream receiving the alert.

15. The non-transitory readable media of claim 11, wherein elevating the priority includes identifying a primary channel and rendering the alert message to the primary channel.

16. An apparatus, comprising:

a memory element;

a processor; and

10

a management element stored in the memory element and configured to interface with the processor such that the apparatus is configured for:

monitoring media streams associated with channels in a communication environment;

receiving an alert in one of the media streams; and

elevating a priority associated with the media stream receiving the alert.

17. The apparatus of claim 16, wherein elevating the priority comprises increasing the volume of the media stream receiving the alert.

18. The apparatus of claim 16, wherein elevating the priority comprises changing a spatial direction for rendering the media stream receiving the alert.

19. The apparatus of claim 16, wherein elevating the priority comprises increasing the volume of the media stream receiving the alert and changing a spatial direction for rendering the media stream receiving the alert.

20. The apparatus of claim 16, wherein elevating the priority includes identifying a primary channel and rendering the alert message to the primary channel.

* * * * *